**UNITED STATES of America,
Appellee,**

v.

**Donald R. NANCE, II, and Thomas
N. Tileston, Appellants.**

No. 74–1047.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1974.

Decided Aug. 20, 1974.

Rehearing and Rehearing En Banc

Denied Sept. 12, 1974.

Theodore F. Schwartz, Clayton, Mo., for appellants.

J. Patrick Glynn, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before LAY, HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This is a joint appeal by Donald R. Nance, II, and Thomas N. Tileston from a jury verdict finding them guilty of seven of the fifteen charged counts of mail fraud in violation of 18 U.S.C. § 1341. In each of the fifteen counts of the indictment Nance and Tileston were charged with use of the mail for the purpose of executing a fraudulent scheme involving the sale of distributorships for merchandise marketed on wire rack displays. Guilty verdicts were returned on seven of those counts, specifically, 2, 4, 5, 6, 7, 12, and 13. Respecting each of those verdicts, Nance and Tileston argue that the evidence was insufficient to sustain a guilty verdict; that the court prejudicially refused to give the jury their "position" instruction; that the voir dire of the jury was

prejudicially curtailed by the court; and that the jurors discussed the case among themselves before the final submission of the case, depriving defendants of a fair trial. We affirm the judgment of conviction as to counts 2, 12, and 13. We reverse as to counts 4, 5, 6, and 7.

*Sufficiency of Evidence.*

Nance and Tileston organized Nance and Associates, Ltd., and other corporations, to serve as. a vehicle in the marketing of rack distributorships. Under the marketing concept adopted for the corporation, the two defendants negotiated to obtain distribution rights from the manufacturers of retail products: Tootsie Toys, manufactured by Strombecker Corporation; and Bardahl, manufactured by Bardahl Petroleum Products. Those manufacturers agreed to ship their products to the dealers procured by Nance and Associates, Ltd., upon receipt of advance payment from Nance and Tileston. The products were packaged by the manufacturers for display and sale on wire racks.

The solicitation of prospective dealers was accomplished by publishing offers to sell distributorship franchises in various newspapers. After a prospective dealer answered an advertisement, a letter by one of the defendants was generally sent to him acknowledging his inquiry. Thereafter a sales representative from Nance and Associates, Ltd., contacted the prospective dealer and delivered a sales pitch wherein it was represented that high quality sales locations would be obtained and continuous operations assistance and a brief training course would be provided to dealers. Interested prospective dealers were then required to deposit $800, as earnest money, presumably to secure the dealership. Procurement of the dealership was eventually confirmed by mail. Under the contract between the dealers and the defendants, the latter were to promptly ship the inventory and racks and arrange for the locations in retail outlets. The route was to be established by the defendants' "marketing engineers" or location men. The dealer was to service the racks regularly and supply regular sales reports to Nance and Associates. All profit from the rack sales was to be retained by the dealer, with a commission payment retained by the retail outlet. The annual profit projections represented to the dealers by the defendants ranged from $5,000 to $10,000 and were set out in the advertisements and the sales manuals. The dealers were to reorder their inventory in the same fashion as the initial sale, by paying the defendants in advance, and the defendants were to have the merchandise shipped directly to the dealers.

At first the business functioned without serious problems. With the inception of a truck strike, however, in April, 1970, causing delays in shipment of inventories and racks, problems began to develop. By midsummer shipment schedules were considerably behind, partially, at least, because of the problems created by the strike. However, the evidence does not establish any deliberate failure to ship merchandise at that time. Beginning early in November, nevertheless, there is proof that cash payments were being received and not immediately applied to merchandise orders. By January, 1971, the Strombecker representative testified, Nance and Associates stopped sending checks altogether and the dealers no longer were receiving their original orders or reorders for which they had paid Nance and Associates in full.

The United States alleged in count 1 of the indictment, as false and fraudulent statements of material facts, that:

(a) Merchandise would be shipped to the dealer promptly after receipt of payment for the dealership.

(b) The dealers would receive substantial earnings promptly after commencement of the dealership.

(c) The dealers were guaranteed that their merchandise would be repurchased.

(d) The dealers would be assisted by trained personnel in establishing a merchandising business.

(e) The dealers would receive continuous operations assistance.

(f) That dealers were selected only after screening.

(g) Marketing specialists would obtain good locations for the sale of rack merchandise.

(h) Earnest money was required to reserve existing dealership route location.

Those allegations were incorporated by reference in each of the subsequent counts which charged violations of 18 U.S.C. § 1341 for each of the fifteen separate mailings to fifteen separate dealers. Nance and Tileston do not challenge the sufficiency of the indictment, but they do maintain that the proof was insufficient to sustain a conviction.

■■■ The essential elements of a violation of 18 U.S.C. § 1341 have been enunciated as "(1) a scheme conceived by appellant for the purpose of defrauding . . . by means of false pretenses, representations or promises, and (2) use of the United States mails in furtherance of the scheme." Gold v. United States, 350 F.2d 953, 956 (8th Cir. 1965). *See also* Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L. Ed. 435 (1954). "Scheme" to defraud within the purview of this section involves some connotation of planning and pattern. Fabian v. United States, 358 F.2d 187, 193 (8th Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966). Thus, intent to defraud is an essential element. It may be inferred by all the facts and circumstances surrounding a transaction. United States v. Porter, 441 F.2d 1204, 1210 (8th Cir. cert. denied, 404 U.S. 911, 92 S. Ct. 238, 30 L.Ed.2d 184 (1971). The "use of the mails" requirement has similarly been judicially construed. To bring the scheme within the ambit of the mail fraud statute, the mails must be used for the purpose of executing the

scheme, Kann v. United States, 323 U.S. 88, 93, 65 S.Ct. 148, 89 L.Ed. 88 (1944); must be employed before the scheme reaches fruition, United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); yet, need not be contemplated as an essential element of the scheme, Pereira v. United States, *supra,* 347 U.S. at 8, 74 S.Ct. 358.

■■■ We have examined the entire record recognizing that the verdict must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L.Ed. 680 (1942). In our opinion there was not sufficient evidence, as a matter of law, to sustain the government's position that a scheme to defraud was devised and implemented from the outset of the business operations of Nance and Associates. To be sure there were representations made which were likely to be misinterpreted by the individuals who purchased dealerships. But the government failed to produce evidence of specific misrepresentations indicating guilty knowledge and fraudulent intent at the outset of the business or immediately thereafter on the part of Nance and Tileston.

Viewing all of the evidence in the light most favorable to the government, including the permissible inferences flowing therefrom, we conclude that the government did prove a scheme to defraud on the part of Tileston and Nance but that such scheme was not proven to have originated at least until early November of 1970. This timing becomes important because the letters which are the subjects of counts 4, 5, 6, and 7 were all mailed prior to the time the scheme was shown to have originated and those letters therefore cannot be said to have been for the purpose of executing the scheme or in furtherance of it. The convictions on those counts must be reversed. As to the remaining counts the evidence was sufficient. Count 2 specifies a letter mailed by Tileston to a Mr. Douglass on March 21, 1971. It related to an original order from Douglass

which was never forwarded to Strombecker and never received by Douglass despite payment in full to Nance and Associates in advance. Count 12 specifies a letter mailed by Tileston to a Mr. Pace on February 11, 1971, in regard to reordering Bardahl products. Pace testified that he paid $301.48 in advance for additional Bardahl products but never received them. Count 13 specifies a letter dated November 10, 1970, from Nance to a Mr. Schultz encouraging Schultz to become a Bardahl dealer. Schultz bought a Bardahl dealership, paying the balance of $2,752.88 on January 4, 1971, and received nothing in return. His request for a refund was ignored.

■ The fact that Nance and Tileston did not personally authorize each mailing by the other is not significant. In Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), a mail fraud case, this Court said:

> Each participant in a scheme to defraud is responsible for the use of the mails and wire used to execute and carry out the scheme.

> " 'Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose of so using the mails to defraud. If they do, the acts of each thereafter, during the existence and execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of the mailing of a letter which one of his partners caused to be mailed in the execution of the scheme.' "

*Id.* at 726 (citations omitted).

For these reasons we conclude that the evidence is sufficient to sustain the verdict as to counts 2, 12, and 13, but not as to counts 4, 5, 6, and 7.

*Position Instruction.*

■ Fed.R.Crim.P. 30 provides that any party may file written requests that the court instruct the jury on the law set forth in the request. We have previously held, in this respect, a party is entitled to a specific instruction on his theory of the case if there is evidence to support it and a proper request for such an instruction is made. Apel v. United States, 247 F.2d 277, 282 (8th Cir. 1957).

■ Justification for resting the right to a position instruction upon the tender of a proper request has been summarized as:

> While lawyers are advocates, there is a duty to present the court with requests fashioned in a form suitable for use by the court, if it so desires.

8 J. Moore, Moore's Federal Practice ¶ 30.03[1] at 30–5 (2d ed. 1973). *See also* United States v. Bessesen, 445 F.2d 463, 468 (7th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368 (1971). Here there was submitted a long, verbose instruction essentially setting forth a defense of good faith, yet containing also a detailed description of the purported evidence and inferences drawn therefrom by defense counsel. In our view the request did not meet the standard of adequacy that a court may require.

■ An additional reason for upholding the action of the trial court on this point is that even when a requested instruction is properly tendered, the court is entitled to use its own language in framing instructions. Wright v. United States, 175 F.2d 384, 388 (8th Cir.), cert. denied, 338 U.S. 873, 70 S.Ct. 143, 94 L.Ed. 535 (1949); 2 C. Wright, Federal Practice and Procedure § 482 at 278 (1969). It is enough that the charge adequately and correctly covers the substance of the requested instructions. Wright v. United States, *supra*, 175 F.2d at 388. Thus when reviewing the adequacy of the instructions, an appellate court must look at the instruc-

tions as a whole, and the court's instructions considered as a whole, cannot be said to have ignored Nance and Tileston's request to state their position. The court made clear that a predicate to a verdict of guilty was that they find each defendant individually participated in a knowing and willful fraudulent scheme. The court's definition of those terms makes clear that good faith would be an absolute defense to the crime. While a more detailed position instruction would have been preferable, we cannot say that the instructions as a whole did not outline the theory of the government's case, the defendants' opposition thereto, and the applicable law.

*Voir Dire.*

Nance and Tileston submitted to the court ten questions to be asked on voir dire of the jurors.[1] While there was no record made of the voir dire, the only objection thereto was the court's failure to ask the submitted questions. A court has wide discretion in conducting the voir dire, Fed.R.Crim. P. 24(a), and need not probe for bias or prejudice by any particular number of questions in any particular form simply because requested to do so. Ham v. South Carolina, 409 U.S. 524, 527, 93 S. Ct. 848, 35 L.Ed.2d 46 (1973). Questions five and ten, if at all relevant, go to the ability of the jurors to render a fair and impartial verdict. No argu-

ment is proffered that the court did not otherwise exhaust inquiries relating to the juror's ability to render such a verdict. The remainder of the questions concern statements of law which are more appropriately dealt with in the instructions to the jury. *See* United States v. Delay, 500 F.2d 1360 (8th Cir. 1974). Indeed, those matters were adequately covered in the final jury charge.

*Juror Misconduct.*

Finally, Nance and Tileston allege jury misconduct in their collective failure to observe the court's admonition not to discuss the case during pendency of the trial. Placing reliance on Winebrenner v. United States, 147 F.2d 322 (8th Cir.), cert. denied, 325 U.S. 863, 65 S.Ct. 1197, 89 L.Ed. 983 (1945), they argue that they were deprived of a fair trial by the improper discussions among the jurors during the course of the trial.

In *Winebrenner* the court held that a trial court's instruction permitting jurors to discuss a case under submission to an extent that they did not form a definite fixed idea pertaining to the case required reversal due to the juror's premature consideration of evidence:

The jury should not discuss the case among themselves because, first, they have not heard all of the evidence; second, they have not heard the instructions of the court as to how this evidence is to be considered by them,

---

1. (1) Do you understand that the defendants are not responsible for unauthorized misrepresentations made by salesmen working for defendants' corporations, unless said defendants authorized, approved and acquiesced in said misrepresentations?

(2) Do you understand that evidence of business failure does not constitute fraud?

(3) Do you understand that the government must prove that the enterprise was set up in its inception to defraud persons?

(4) Do you understand that the failure to deliver merchandise as per agreement entered into between defendants' corporations and third parties does not constitute fraud?

(5) Will each juror require the same performance of the defendants' corpora-

tions as they would of any parties allegedly defrauded?

(6) Do you understand that the written contract between the parties represents the entire agreement of the parties?

(7) Do you understand that the misrepresentations, if any, must be of a present, existing fact and not a future representation?

(8) Do any members of the panel feel the defendants are guilty because they have been indicted?

(9) Do you understand that the indictment is not to be considered as evidence of guilt and raises no presumption of guilt?

(10) Does any member of the panel know Mr. John Mitchell, Mr. Richard Kleindienst, or Mr. Elliot Richardson?

and neither have they heard the arguments of counsel. The crime here charged was not a common one with which the layman is more or less familiar, such as larceny or other well known common law crime, but it was a statutory crime more or less technical and intricate in its nature, with which the ordinary layman was wholly unfamiliar. For this additional reason the jury could not give intelligent consideration to the evidence without the assistance of the court's instructions. *Id.* at 328. This case, of course, can be readily distinguished from *Winebrenner* since the court did not give an instruction which encouraged the jurors to discuss the case, but rather admonished them against discussing the case.

Fed.R.Crim.P. 51 provides that to preserve for review any acts or omissions of a trial court the party must "make known to the court the action he desires the court to take or his objection to the action of the court and the grounds therefor." In this case it was not until after the verdict was rendered that the matter was first drawn to the attention of the court. At the hearing on a motion for new trial an associate of defense counsel testified that immediately after the case was submitted to the jury, the alternate juror, who was then excused, told defense counsel that the jury had been discussing the case throughout the trial. "A party may not stand idly by, watching the proceedings and allowing the *Court to commit error* of which he subsequently complains." McNeely v. United States, 353 F.2d 913, 917 (8th Cir. 1965). *See also* United States v. Hester, 489 F.2d 48, 50 (8th Cir. 1973).

An additional reason for our decision on this point is that this evidence, coming from counsel rather than from the juror is, of course, hearsay. The defense did not call any of the jurors themselves and question them about participation in any discussions during the course of the trial. Furthermore the testimony of the defense associate counsel was to the effect that despite the alleged discussions, he was advised by the alternate juror that no juror had firmly made up his mind. A trial judge's decision against granting a new trial for juror misconduct will be overturned only for an abuse of discretion. McDonnell v. United States, 457 F.2d 1049, 1052 (8th Cir.), cert. denied, 409 U.S. 860, 93 S.Ct. 148, 34 L.Ed.2d 107 (1972). Finding no proof of prejudice in the juror discussions, nor, indeed, any competent proof that such discussions took place, we cannot say that there has been any abuse of discretion by the district judge in denying the motion for new trial.

For the reasons hereinbefore set forth, the judgment of conviction is affirmed as to counts 2, 12, and 13, and is reversed and remanded as to counts 4, 5, 6, and 7.