**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gary MINKIN, Defendant-Appellant.**

**No. 74–1004.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1974.

Decided Sept. 27, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 18, 1974.

Certiorari Denied Feb. 18, 1975.
See 95 S.Ct. 1122.

Milton Eisenberg, Washington, D. C., for defendant-appellant.

Terry I. Adelman, Asst. U. S. Atty., St. Louis, Mo., for plaintiff-appellee.

Before JOHNSEN and VAN OOSTERHOUT, Senior Circuit Judges, and TALBOT SMITH, Senior District Judge.[*]

JOHNSEN, Senior Circuit Judge.

## I.

Gary Minkin, operator of a salvage and used-parts business, was charged in a single-count indictment and convicted on a jury trial of a violation of the mail-fraud statute, 18 U.S.C. § 1341.[1]

The fraud involved, as implicit in the jury's verdict, consisted in Minkin's having devised and executed, together with a claims supervisor of the Hartford Insurance Group (Hartford), named Dace, a scheme to get Hartford to issue a comprehensive insurance policy to Minkin on a 1967 Cadillac El Dorado automobile (stated in the application to be a 1968 model) which had been the subject of payment by another insurance company to its previous owner of a total loss by fire and had then been disposed of by the insurance company to Minkin as a salvage item; making false representation in the application to Hartford that the automobile was "in good mechanical condition and free of any evidence of physical damage"; having Hartford issue a policy as applied for; making claim against Hartford that the automobile had thereafter been the subject of a theft and fire occasioning a total loss to Minkin; and collecting on this basis, by a draft payable to Minkin in the sum of $4,931.85, the proceeds of which he divided with Dace.[2]

---

[*] TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. Minkin was sentenced to a term of three years, with six months thereof to be served in a jail-type institution, and the balance on probation, conditioned on his making restitution.

2. Dace had been charged for his part in the fraud in a separate indictment, which also contained twenty-three other counts against him for similar insurance frauds against Hartford. He was permitted to plead guilty to three of all these counts and, according to his testimony, was given a ten-year sentence, which he was engaged in serving at the time of Minkin's trial. These proceedings were had before another district judge.

Hartford thus was caused to pay Minkin for a loss which he never suffered. Dace, instead of handling the adjustment of the fictitious loss himself, turned it over to an independent adjuster who made examination of the automobile upon Minkin's car lot, assumed that its condition was the result of the claimed theft and fire, and made appraisal and report that the condition of the car constituted a total loss, with only a salvage disposal being possible in the situation. Dace had precedingly drawn up and placed in the file a fictitious police report purporting to show that the car had been duly reported to the authorities as stolen and then recovered in its burned condition.

The use of the mail relied on in the indictment as basis for the fraud coming within § 1341, consisted in the mailing of Minkin's application to the regional office of Hartford by the broker who had handled the obtaining of the insurance, and in the alleged reasonable foreseeability by Minkin that this mailing would occur as a matter of ordinary business course in the insurance broker's dealing with the application. Under the interpretation made of § 1341 in Pereira v. United States, 347 U.S. 1, 8–9, 74 S. Ct. 358, 363, 98 L.Ed. 435 (1954), and in other court decisions—*e. g.,* Fisher v. United States, 324 F.2d 775, 780 (8th Cir. 1963), United States v. Grow, 394 F.2d 182, 205–206 (4th Cir. 1968)—the existence of such a foreseeability in the situation would entitle Minkin to be legally regarded as having caused the mailing.

## II.

The principal issue presented for review is the sufficiency of the evidence to go to the jury on (a) whether the broker had actually used the mail to forward the application to Hartford, and (b) if so, whether such a use of the mail by the broker could properly be found to have been reasonably foreseeable by Minkin.

On question (a), Minkin argues that there was no direct proof of a mailing of the application having been made by the broker or his secretary, nor of a receiving of it through the mail having occurred at Hartford. The contention is that there was such possibility that the broker had hand-carried the application to the Hartford office instead of mailing it that reasonable doubt on what the fact was should be held to exist as a matter of law.

The testimony of the broker, however, was positive and unshaken that he had never hand-carried any applications for individual automobile policies to the Hartford office, but invariably handled this class of business by mailing the signed application to Hartford for acceptance and issuance of the policy. He firmly stated that the only class of automobile insurance on which he ever hand-carried any papers to the Hartford office was on commercial risks or accounts, as to which signed applications were not required, but discussion, engineering and negotiation ordinarily were necessary to effect the underwriting and settling of premium rates.

Application forms used by the broker for individual policies bore the name of the company to which the application was to be submitted, and according to his testimony he always drew an arrow on the application pointing to the company's name for mailing purposes by his secretary and then placed it in the secretary's outgoing mail basket. The application here, which was put in evidence from Hartford's files, bore such an arrow mark made by the broker. Any possibility that the secretary could have hand-carried the application to the Hartford office instead of mailing it was negatived by proof that she had never at any time been in Hartford's office.

In addition, the situation was plainly not one of an application having been brought in and a policy carried out in completion of the insurance transaction, for a period of time had intervened between the date on which the application was shown to have been received by Hartford and the date on which the policy was issued by it. The jury further

could find some corroboration as to the application having been mailed in the fact testified to by the broker that during the period involved and for a period preceding he had been putting in only part time at his office because of a heart attack from which he was recovering and had not at all in that time been in the Hartford office for any purpose.

All this provided adequate probative basis for the jury to be allowed to pass on the mailing question and to entitle it to be found that the application had in fact been mailed by the broker to the Hartford office.

■ On question (b), *supra*, as to the occurrence of such a mailing of the application being reasonably foreseeable by Minkin, we further agree with the trial court that adequate probative basis existed for inference, evaluation and conclusion to entitle the matter of reasonably foreseeability by Minkin to be submitted to the jury. This is a day in which, within common knowledge and experience, the mail has come to constitute an instrumentality of general use in ordinary business incidents. In the situation here, the broker's place of business was located in the suburbs and Hartford's office in the heart of downtown St. Louis, a distance of some twelve miles from each other. We think the jury could properly regard Minkin, who himself operated a substantial business, as not being able credibly to claim that he believed or assumed that the broker in ordinary business course would take the time and undergo the inconvenience of making a twelve-mile trip into downtown St. Louis and back, instead of using a ten-cent stamp, to get the application into the hands of Hartford, and particularly where, as here, there was recognizedly no emergency or other element of immediacy involved.

But even more directly probative on the question of reasonable foreseeability, there was evidence showing that at the very beginning the broker had used the mail to transmit the application form to Minkin for execution, and that Minkin in turn, after filling it out, had mailed it back to the broker with a check for the premium requested. Also, this use of the mail, both by the broker and by Minkin, in handling the application between them, with the distance thus involved consisting of ten miles, had preceded the mailing of the application to Hartford.

On all these elements together, it would not, in our opinion, be entitled to be held as a matter of law that the mailing of the application by the broker to Hartford was not reasonably foreseeable by Minkin.

That use of the mail to handle such routine application incidents constituted a matter of ordinary business course in the insurance field here involved was further indicated by the facts, which there was testimony to show, that after the broker had mailed the application to Hartford, Hartford returned it to him in the same manner, together with Minkin's check because of an error in the amount of the premium which Minkin had been charged, and that after Minkin had sent the broker a check for the deficiency, the broker, "again forwarded the whole thing back to Hartford."

■ As previously noted, within the interpretation made in *Pereira, supra,* of the term "causes" as used in § 1341, use of the mail as a necessary or facilitating instrument to effect the execution of a scheme to defraud, "where such use can reasonably be foreseen," gives rise to a violation of § 1341. 347 U.S. at 9, 74 S.Ct. at 363. One who engages in carrying out a scheme to defraud is therefore responsible under § 1341 for a use made of the mail to effect a necessary or facilitating incident thereof where such use is from the nature of the business and the incident one of such ordinary course as to constitute a matter of natural expectability. A use of the mail which is of such a general, expectable occurrence is entitled to be found to be reasonably foreseeable. Thus, we observed generally in Fisher v. United States, 324 F.2d 775, 780 (8th Cir. 1968), as to the ordinary course of such

an insurance business as is here involved:

> Certainly in dealing with insurance agents it will be contemplated that the mails will have to be employed in carrying on business with the different companies for whom the agent does business.

### III.

■ The next contention urged for reversal is that even if the evidence was sufficient to prove that the application had been mailed by the broker to Hartford and that the handling of the application in this manner between the broker and Hartford was reasonably foreseeable by Minkin, the existence of these facts would not be controlling because they had relation to the issuance of a policy and ignored the fact that the broker had subjected the situation to binder coverage while the application was running its course.

The fallacy in this is that there was evidence showing that the policy had been approved and issued by Hartford before the date of the alleged loss. A copy of the policy was shown to be contained in Hartford's files. While Minkin testified that he had never received it, the jury was not required to believe this testimony. Even, however, if the situation could have been one in which the policy had not been received by Minkin personally, but had instead been taken charge of by Dace as a means of facilitating the handling of the fictitious loss, this would legally constitute a receipt of the policy by Minkin. It would not enable the consequence to be escaped that the policy had been issued, that it legally was in effect, and that the binder coverage had thereby ceased. Moreover, the draft which had been issued to Minkin for the fictitious loss bore on its face the number of the issued policy and could be endorsed and cashed by him only as payment of a loss under the policy coverage.

Attempt has been made to argue to the effect that Hartford's return of the application to the broker and the subsequent remailing of it by the broker to Hartford with Minkin's additional premium check amounted to such a break or change in circumstances as to leave the original mailing of the application without status as an element in the execution of the fraud. The argument is specious. No change was made in the application. The coverage sought by it remained the same. The false representation therein as to the condition of the car continued as the basis for getting the policy issued. The initial consideration of the application constituted a part of the policy approval and issuance process. In short, the submitting of the application by Minkin and the mailing of it by the broker to Hartford as originally made represented means used or caused to be used by Minkin to enable him to accomplish the scheme to defraud.

### IV.

■ A further contention is made that the court erred in refusing to grant a motion for a mistrial because of a conversation about the case and about Minkin which occurred between three postal inspectors while eating lunch at a table in a restaurant located some seven or eight feet away from where two jurors were seated.

The postal inspectors became aware of the presence of the two jurors, they said, when the jurors, after finishing their lunch, passed by the inspectors' table in leaving the restaurant. The inspectors immediately reported the situation to the Assistant United States Attorney, who in turn informed the trial judge and defense counsel of the matter in chambers. Discussion was had of the manner in which the incident ought to be handled. The judge proposed that he would inquire of the jury generally in the courtroom whether any of them had had lunch at the restaurant involved; that he would then question each juror separately, out of the presence of the other members of the jury, who made an affirmative response by raising his hand, on whether he had overheard any

conversation or discussion in the restaurant about the case or any similar matter; and that when he had finished his questioning of the individual juror, he would allow counsel to submit any further questions to him which either of them desired to have asked.

Two jurors, which was the number that the postal inspectors stated had passed their table, made affirmative response to the judge's initial inquiry as to eating lunch at the restaurant. The general inquiry as to having eaten lunch at the restaurant was thereafter repeated in order to leave no uncertainty as to the other ten jurors. The judge then excused the members of the jury from the courtroom except one of the responding jurors; engaged in careful questioning of the juror, with counsel present throughout; inquired of each counsel if he had any further questions that he desired to have put to the juror; and upon each of them replying in the negative, had the juror leave the courtroom, the other responding juror brought in and the same procedure engaged in as to him.

Each of the two jurors testified that he had overheard no discussion or conversation of any nature in the restaurant, either about the case, about any situation of similar nature, about Minkin or about anything else. They had simply sat there eating their lunch, talking with each other and leaving the restaurant when they were finished. Each had seen one of the postal inspectors enter the restaurant, but did not observe where he went or became seated, and had heard nothing at all on the part of the inspector or anyone else.

The court then overruled the motion for a mistrial, stating that "all we have here" is that the postal inspectors and the two jurors had eaten in the same restaurant. There occurred no communication or contact or suggestion thereof on which the situation could be "deemed presumptively prejudicial." Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450 451, 98 L.Ed. 654 (1956). As in Mee v. United States, 316 F.2d 467, 469 (8th Cir. 1963), there was nothing that was capable of creating any possibility of prejudice.

Defendant contends, however, that the court should have questioned the postal inspectors to make certain that the two jurors were in fact the ones who had been seated seven or eight feet from the inspectors. The court alternatively suggested that the postal inspectors and counsel remain in the corridor until after the jury had taken their seats, and that to avoid attracting the jury's attention, the inspector who had noticed the two jurors could then look through the window in the courtroom door to see if he could identify them. The inspector reported that he was positive as to one of them, but was not able to say as to the other. There is however no room for any reasonable doubt, on the interrogation made and the responses given, that the two jurors were in fact the ones involved. The court correctly summarized the situation as follows:

> [T]hese two gentlemen, under the closest and more (sic) careful kind of interrogation I can conceive, and separate and apart from each other, and presumably not knowing what we were inquiring about, had the exact same explanation of the events.

There was nothing that called for any further probing or pursuit in relation to the incident.

The court advised the two jurors that there was nothing wrong involved in their having eaten lunch at the restaurant or in the circumstances thereof, but requested that "you not discuss any of this with the other jurors." To have left the situation with an implication in the minds of the two jurors that they were in some way under suspicion of an impropriety, or to have surrounded the situation with such an air of mystery and unnecessary prolongation as to cause the other jurors to become possessed of an absorbing curiosity, might itself give rise to a hampering distraction and even a possible prejudice in the jury's consideration of the case. The court engaged in such proceedings as

were necessary to protect the defendant and leave no possible doubt as to the actual facts. The claim of error in the court's refusal to grant a mistrial is without merit.

## V.

■ The final point urged in Minkin's brief is the court's refusal to make available to him the transcript of testimony which Dace had given before a grand jury. The grand jury was not the one by which Minkin and Dace had been indicted, but that fact was not of ·controlling significance for the amendment made to the Jencks Act in 1970, 18 U.S.C. § 3500(e)(3), by which grand jury minutes were brought within the Act, was not limited in its application to those of the grand jury by which the indictment in the case had been returned, but extended to "a statement [of a Government witness], however taken or recorded, or a transcription thereof, if any, made by said witness to *a* grand jury." (Emphasis added.) Such transcript or minutes, however, like other statements or reports within the Act, can be demanded for inspection only "after a witness called by the United States has testified on direct examination" and then only as to the portion thereof "which relates to the subject matter as to.which the witness has testified." § 3500(b).

Government counsel objected to the production of the transcript on the ground that it had no relation to the subject matter of Dace's testimony on the trial. The court reviewed the transcript *in .camera,* supplied defendant with a copy of a small portion thereof, and ordered the transcript sealed. In the part which was thus supplied, Dace admitted that he had previously been convicted in a Missouri state court of the fraudulent use of a credit card. Our examination of the sealed transcript shows that Dace had also admitted to the grand jury that he was at the time under indictment for the Hartford fraud offense (see fn. 2, *supra*), but that fact had been brought out in his testimony

(and Minkin also otherwise would certainly have known of Dace's indictment), so that it would not be possible for any error or prejudice to exist or be claimed from the court's having overlooked providing Minkin a copy of Dace's testimony in this respect.

As the trial court held on its initial reading of the transcript, "there is no reference whatsoever [therein] to Mr. Minkin directly or indirectly or inferentially or otherwise." The court took occasion after adjournment for the day to again go over the transcript and further stated the following morning: "I am totally convinced that there is nothing in there that relates to the subject matter of this case." Our reading of the transcript substantiates that appraisal. Defendant was not entitled to have the transcript.

## VI.

Minkin has interspersed his argument on some of the issues which he has raised, as discussed above, with challenges to parts of the court's instructions and to the failure to give some instructions tendered by him. These challenges are without merit. He asserts, for instance, that "[i]n giving various instructions the court continuously conveyed to the jury the impression that mailing of the letter could be presumed." He points to such expressions as "at the time it was mailed," "at the time the application for insurance was mailed or caused to be mailed," and "the letter mailed." These phrases have been lifted out of the setting in which they occur. They represented simply general language in instructions which dealt with and whose purpose was to call the jury's attention to elements which would re·quire it to acquit. One example is sufficient to demonstrate:

> If the jury should find that at the time the application for insurance was mailed or caused to be mailed, as charged, the application for insurance so mailed was then true and correct, the fact that the Cadillac El Dorado may thereafter have become in poor

condition and not free from fire damage, would not warrant a verdict of guilty.

The court had previously told the jury that use of the mail in furtherance of the scheme to defraud was an essential element of the offense charged; that the burden was on the prosecution to prove beyond a reasonable doubt every essential element of the crime charged; that it was the jury's right and responsibility to determine all the facts; and that it had been the court's purpose "to express no opinion upon the facts in the case." There is nothing in the instructions given when considered on this basis that could cause the jury to be misled. Similarly, on such consideration of the court's charge, there was no error in the court's refusal to give the tendered instructions.

## VII.

For some reason which is not apparent, only the mailing of the application by the broker to Hartford was relied on in the indictment. Other mailings, however, such as Minkin's forwarding of the executed application and premium check to the broker, which there was evidence to show had occurred, were, nonetheless, competent and relevant upon the question of Minkin's foreseeability.

We also should add that United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) relied on by Minkin is inapplicable here. The mailing in *Maze* was held by the Supreme Court to have occurred after the scheme to defraud there involved had "reached fruition," or in other words had been executed. Here the mailing of the application was a salient factor in effecting the execution of the scheme.

Other arguments have been made in Minkin's brief on evidentiary aspects which involve mere factual issues that have been determined by the jury's verdict.

Affirmed.