UNITED STATES of America, Appellee,

v.

Hershey MOSS, Appellant.

No. 78–1261.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1978.

Decided Jan. 15, 1979.

David C. Godfrey, Clayton, Mo., for appellant.

Terry I. Adelman, Asst. U. S. Atty. (argued), and Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief, for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and BRIGHT, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

Hershey Moss appeals from his jury conviction on one count of conspiracy to kidnap for the purpose of murder in violation of 18 U.S.C. § 1201, seven counts of mail fraud in violation of 18 U.S.C. § 1341, and eleven counts of wire fraud in violation of U.S.C. §§ 1343 and 2. Moss received consecutive two-year sentences on each of the fraud counts to run concurrently with a life sentence on the conspiracy count. We affirm in part and reverse in part.

Viewed in a light most favorable to the Government, the evidence established the following facts. In February 1977, the defendant approached his neighbor, Steve Carter, to discuss the possibility of acquiring some insurance in connection with the corporation Moss was forming. The corporation, Kandy Kane Productions, Ltd., was to be in the business of staging motorcycle thrill shows across the country. Its star performer and main money-maker would be Maurice Smith, whom Moss described as the Midwest jumping champion with over eight years of experience. Smith was to be billed as the black Evil Knievel. Moss told Carter that he wanted one million dollars worth of insurance on the life of Smith with the corporation as the principal beneficiary.

Moss agreed to allow Carter, who was an insurance agent for the Frank B. Hall Insurance Company in St. Louis, to attempt to place the "key man" insurance on Smith's life.

After calling the proposed insured at his residence in Chicago to obtain preliminary underwriting information, Carter made inquiries with the insurance carriers with which his company had a close working relationship to see whether they would entertain underwriting the risk. Carter also utilized the services of another brokerage firm, the Strauss Fuchs Organization (SFO) in Kansas City, Missouri. SFO acted as a correspondent for various insurance carriers which would occasionally underwrite high-risk insurance. Carter dealt with these carriers indirectly through the offices of SFO.

Initial efforts to place the insurance were not successful.[1] Moss was particularly concerned about obtaining the insurance prior to the weekend of April 22–24, when Kandy Kane staged a motorcycle thrill show in Chicago. Moss lost approximately $168,000 on the show when Smith refused to perform. However, upon his return to St. Louis, Moss told Carter that he had broken even on the event and still wanted Carter to obtain insurance.

On May 15, Carter received a telephone call from a representative of SFO informing him that First Colony Life Insurance Company had tentatively agreed to insure Smith for $500,000. Shortly thereafter, Carter received a letter from SFO which confirmed the offer. Carter spoke with Moss over the telephone and obtained his acceptance of the offer. On May 9, Carter mailed a business reply postcard back to SFO which indicated that the offer was acceptable. [Count Two]. On May 25, Carter and Moss travelled to Chicago to meet with Smith and to obtain information for the formal application for life insurance from First Colony. Upon his return to St. Louis, Carter mailed the application to SFO on May 26. [Count Three].

---

1. Crown Life Insurance declined the risk on March 25. On April 18, the Insurance Company of North America (INA) tentatively agreed to insure Smith for $250,000, but after Carter obtained a premium check from Moss and mailed it to INA the check was returned due to a major miscalculation by INA as to the amount of the premium.

On June 14, Wanda Davis of SFO telephoned Carter and advised him that the policy had been approved and was in issue. Later that day, Davis mailed a letter to Carter to confirm this information in writing. [Count Four]. Carter immediately contacted Moss who promptly furnished a check for the quarterly premium which Carter mailed to SFO on June 15. [Count Five]. Carter received the letter of confirmation from Davis on June 16.

On June 20, Joan Welch of SFO mailed the actual insurance policy to Carter. Accompanying the policy was a letter which indicated that the policy was issued with a delivery requirement that Moss and Smith had to sign an amendment to the application. Carter arranged for the two men to sign the amendment and had it mailed to SFO on June 15. [Count Seven].[2] Further efforts to acquire additional insurance were discontinued upon Moss's request.

During July and August, Moss and Maurice Smith had a number of telephone conversations during which Smith threatened to leave Kandy Kane. In order to keep Smith with the corporation until he could be killed for the insurance proceeds, Moss began sending him various amounts of money. From September 7 to October 26 Moss wired money to Smith in Chicago on eleven occasions [Counts Eight-Fifteen, and Seventeen-Nineteen], some of which were to finance Smith's bus trip to St. Louis on October 27. Moss had told Smith to come to St. Louis to practice for a tour of Japan which Kandy Kane was planning.

On October 25, Lt. Kenrick Dempsey, a police officer for the city of Overland, Missouri, received a telephone call from the defendant whom he had known for almost eight years. Initially, the defendant inquired whether Dempsey did any work "on the side." In a subsequent telephone call that evening, the defendant asked Dempsey to kill someone for him within the next couple of days. The following day, Dempsey received another phone call from the defendant during which details were discussed as to weapons, location, price, and Moss's insistence on accompanying Dempsey during the planned murder. The two men arranged to meet the next day. Dempsey reported these conversations to his superior, and the FBI was notified.

On October 27, Dempsey met with an FBI agent who agreed to observe the meeting between Moss and Dempsey. At this meeting, Moss told Dempsey that he wanted Maurice Smith killed in order to collect the proceeds of an insurance policy on Smith's life. Moss explained that he wanted Smith killed in East St. Louis, Illinois, because "dead niggers" were not investigated there. It was agreed that the two men would meet Smith when he arrived that night at the bus station. There, Dempsey would simulate placing Smith and Moss under arrest and drive them into Illinois where Smith was to be shot and killed.

Dempsey left Moss and met with FBI agents to whom he related Moss's plan. The agents equipped Dempsey with a body recorder and an automobile which contained another recording device. The agents also instructed Dempsey that they would "close in" on Moss when Dempsey simulated the arrests. That evening, Dempsey met Moss and drove him to the bus station where they waited for Smith to arrive. Their conversations were recorded. The men waited for almost two hours but Smith failed to appear. Before departing, Dempsey agreed to call Moss the next morning.

The next day, Dempsey reported to the FBI office and met Maurice Smith who had arrived in St. Louis on a later bus. Smith had been met by FBI agents who apprised him of his predicament and obtained his consent to participate in a staged killing. After both Dempsey and Smith telephoned the defendant, they accompanied the agents to a location in East St. Louis and rehearsed the staged killing. Upon returning to the FBI office, the two men telephoned Moss once again.

**2.** Count Sixteen, the remaining mail fraud count, involved the mailing of the second quarterly premium check to First Colony on October 14, 1977.

The FBI agents then took Smith to the St. Louis Library where he had arranged to meet Moss. Dempsey picked up Moss, drove to the library and staged the arrests. Dempsey then drove both men across the state line and staged the killing of Smith. On the drive back to St. Louis, Moss told Dempsey that he was going to call his attorney, Bernard Steinger, to see whether he could provide him with an alibi for the time of the killing. Moss was arrested by the FBI later that afternoon.

I. Admissibility of Tape Recordings.

With the consent of Lt. Dempsey and Maurice Smith, the FBI made tape recordings of conversations that these men had with the defendant on October 27 and 28, 1977, the days before and of the staged murder. The tape recordings were played before the jury over defendant's objection. Defendant argues that no proper foundation was laid for the admission of these recordings into evidence because the FBI agent in charge of the monitoring admitted that he failed to check the recording equipment to ascertain its capacity of picking up sound. This contention is without merit.

This court set out the foundational requirements for the admission of evidence obtained by electronic surveillance in *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir. 1975).[3] As we recently stated, the purpose of the *McMillan* foundational requirements

> is to insure that only competent and reliable tape recording evidence adverse to an accused is allowed to go before the trier of fact. These requirements do not, however, exist *in vacuo*; they become meaningful only when viewed in light of the facts of a specific case.

*Durns v. United States*, 562 F.2d 542, 547 (8th Cir. 1977). Here, the very fact of the existence of the tape recordings establishes that the recording devices were capable of picking up sounds. Furthermore, both Dempsey and Smith reviewed the recordings and testified that the tapes accurately and fully portrayed their conversations with the defendant. We hold, therefore, that the Government sufficiently complied with the *McMillan* foundational requirements and that the trial court properly admitted the tape recordings into evidence.

Moss also contends that the tape recordings should not have been admitted into evidence because the Government did not affirmatively prove that the FBI had received authorization from the Attorney General for the consensual monitoring of defendant's conversations. Defendant requests that we remand the case to the trial court for a ruling on this issue which was not raised below.[4]

We are of the view that affirmative proof of Attorney General authorization for consensual monitoring of conversations by the FBI need not be produced by the Government as a prerequisite to the introduction of resulting tape recordings into evidence. No statutory provision has been violated. Nor has there been a violation of the defendant's constitutional rights since both Smith and Dempsey consented to the monitoring. See *United States v. McMillan, supra*, 508 F.2d at 104. The administrative regulation complained of is merely an "in-house" procedural requirement that is not designed to protect any individual rights. *United States v. Moskow*, 443 F.Supp. 571, 575 (E.D.Pa.1977); but *cf. United States v. Caceres*, 545 F.2d 1182, 1186–87 (9th Cir. (1976), cert. granted, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784

---

**3.** The *McMillan* requirements are: (1) That the recording device was capable of taking the conversation now offered in evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made in the recording. (5) That the recording has been preserved in a manner that is shown to the court. (6) That the speakers are identified. (7)

That the conversation elicited was made voluntarily and in good faith, without any kind of inducements.

**4.** The defendant contests the Government's assertion on appeal that the FBI properly obtained emergency authorization from the Attorney General for the consensual monitoring of his conversations with Dempsey and Smith.

(1978). The cost of excluding such highly probative evidence far outweighs any potential benefit in deterring possible technical violations of internal control regulations. Therefore, we refuse to remand this issue to the trial court because suppression would not be warranted for the grounds alleged.

## II. Conspiracy.

Count One of the indictment charged the defendant with conspiracy with persons known and unknown to kidnap Maurice Smith in violation of 18 U.S.C. § 1201(c).[5] As part of the conspiracy the indictment alleged that the conspirators acquired an insurance policy on the life of Maurice Smith. It was further alleged that the conspirators would (1) hire an individual to kill Smith, (2) lure Smith from Chicago to St. Louis, (3) abduct Smith in St. Louis and transport him to East St. Louis, Illinois, and (4) murder Smith for the proceeds of the insurance policy on his life.

At trial, the Government attempted to show that Moss had conspired with his former attorney, Bernard Steinger, who was named in the bill of particulars as the only known (but unindicted) co-conspirator.[6] Apparently, Steinger had performed some legal services in connection with the incorporation of Kandy Kane and had a small financial interest in the corporation. Lt. Dempsey testified that Moss told him that Steinger knew what Moss was planning to do and that Steinger would provide Moss an alibi for the time of the killing. The Government introduced evidence that Moss telephoned Steinger shortly after returning from the scene of the staged murder. In addition, Maurice Smith testified that after he threatened to leave Kandy Kane, Moss told him that Steinger was going to travel to Japan to promote a show featuring Smith. To assuage any suspicions held by Smith, Moss provided Smith with a copy of a letter written by Steinger to Kandy Kane concerning the Japan promotion.[7] However, Moss told Dempsey that he had no intention of putting on any shows. The Government theorized that Steinger prepared and placed the letter in the Kandy Kane file in order to cover all angles in any criminal investigation into Smith's death. Defendant argues that he acted alone[8] and that the Government failed to establish that a conspiracy existed. We agree.

Obviously, a man cannot conspire with himself. *Morrison v. California*, 291 U.S. 82, 92, 54 S.Ct. 281, 78 L.Ed. 664 (1934). The essence of any conspiracy is an agreement between two or more individuals to commit a crime. *Iannelli v. United States*, 420 U. S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d

---

5. § 1201 Kidnaping.

 (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, when * * *

 (1) The person is willfully transported in interstate or foreign commerce; * * *

 * * * shall be punished by imprisonment for any term of years or for life.

 * * * * * *

 (c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

6. Steinger did not testify at the trial.

7. The letter, dated July 1, 1977, and typed on Steinger's legal stationery, read as follows:

 Gentlemen:

 Thank you for the brochures on the jumpers. This will confirm my conversation regarding the going to Japan to put a tour together for the entire group, and to feature "Maurice the Magnificent."

 I will make the trip upon receipt of $7,500, payable in advance, Five Thousand Dollars to be applied towards my fee, and the $2,500 to be applied against all expenses; you will pay all expenses as billed.

 I will await your instructions.

 Thank you for the opportunity of being of service, I am

 Very truly yours,

 Bernard Steinger

8. Although there is no question that Moss hired Lt. Dempsey to kidnap and murder Maurice Smith, "there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy." *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977); see also, Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 926 (1959).

616 (1975); *United States v. Kelley*, 545 F.2d 619, 624 (8th Cir. 1976). The agreement need not be formal or express. Indeed, since conspiracy is seldom susceptible of proof by direct evidence, it may be properly adduced from the conduct of the alleged conspirators and the attending circumstances. *United States v. Pelton*, 578 F.2d 701, 712 (8th Cir. 1978); *Rizzo v. United States*, 304 F.2d 810, 825 (8th Cir. 1962). However, mere association with an individual engaged in an illegal enterprise does not make a person a conspirator. *United States v. Frol*, 518 F.2d 1134, 1137 (8th Cir. 1975); *United States v. Collins*, 552 F.2d 243, 245 (8th Cir. 1977). Nor is mere knowledge, approval or acquiescence in the object of an alleged conspiracy sufficient to render an individual a part of a conspiracy. There must exist some element of affirmative cooperation or agreement to cooperate in the object of the conspiracy. *United States v. Hassel*, 547 F.2d 1048, 1053 (8th Cir. 1977); *United States v. Collins, supra*, 552 F.2d at 245.

Although the statements attributed to the defendant create a suspicion that Steinger was involved in the kidnap-murder scheme, the proof falls short of establishing the requisite agreement between the two men. There is little or no evidence to suggest that the July 1st letter written by Steinger was anything but sincere. The only other evidence even suggesting an agreement was the phone call from Moss to Steinger after the staged murder. We are not persuaded that this evidence is sufficient to convince a fair minded jury beyond a reasonable doubt that an agreement existed between Moss and Steinger.

■■■■■ The Government also attempted to establish that Moss conspired with other unknown and unindicted individuals. Lt. Dempsey testified that Moss told him he had hired some individuals to have Smith killed in Chicago, but that these attempts had been unsuccessful and had cost Moss a lot of money. Smith testified as to these events. However, these attempts are outside the scope of the conspiracy with which Moss was charged and may not be used to establish his guilt. Smith also testified to two occasions in St. Louis during which he felt his life was in danger, but we cannot say that this evidence is sufficient to establish a conspiracy in violation of 18 U.S.C. § 1201(c).[9]

### III. Mail Fraud.

### A. Intent to defraud.

■■■■ In order to establish a mail fraud violation under 18 U.S.C. § 1341, the government must prove "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see United States v. Nance*, 502 F.2d 615, 618 (8th Cir. 1974). Defendant contends that the evidence is insufficient to establish that he intended to defraud the insurance company at the time of the mailings with which he was charged.[10] However, reviewing the evidence in a light most favorable to the

9. The Government also sought to establish the conspiracy by introducing a statement made by the defendant to the FBI agents after his arrest. The defendant was asked if he would cooperate and tell the FBI who his alleged co-conspirators were. Moss said nothing at the time but later stated, "What if I told you that there were four other persons involved?" Such a post-arrest admission must be corroborated by independent evidence. *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *Gay v. United States*, 408 F.2d 923, 929 (8th Cir. 1969). No such corroboration was provided.

10. Moss makes a similar contention with respect to the wire fraud counts. He argues that he could not have entertained a fraudulent intent when he wired money to Smith because he did so only at Smith's request. This contention is without merit. Smith testified that after he threatened to leave Kandy Kane Productions, Moss told him to call him collect if he ever needed money. Smith did so and Moss wired the money to Smith in Chicago. Lt. Dempsey testified that Moss said he had been wiring money to Smith to give him something until he could be killed. Some of the wire transfers were made to finance Smith's October 27th trip to St. Louis where Moss was arranging his murder. The jury was entitled to infer from this testimony that Moss was acting with a fraudulent intent when he wired the money to Smith.

government, we find the evidence sufficient to support the jury's verdict. Prior to and at the time of applying for insurance on the life of Maurice Smith, Moss furnished his insurance agent with false information about the proposed insured. Moss also instructed Smith to supply the insurance investigators with the same false information. Moss also told his insurance agent that he had broken even on the April 22–24 show when in truth he had lost approximately $168,000. These actions occurred before the first mailing alleged in the indictment and are consistent with Moss's later assertion that he wanted Smith killed to obtain the insurance proceeds. The evidence was sufficient for the jury to conclude that Moss specifically intended to defraud the insurance company at the time of the alleged mailings.

B. Use of the Mails.

The mailing element of 18 U.S.C. § 1341 consists of two requirements: (1) that the defendant "caused" the use of the mails and (2) that the use was "for the purpose of executing" the scheme to defraud. *See United States v. Maze*, 414 U.S. 395, 399–400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Kann v. United States*, 323 U.S. 88, 93–95, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *United States v. Brown*, 540 F.2d 364, 375–76 (8th Cir. 1976). Defendant contends that the evidence is insufficient to establish that he caused the mailing alleged in Count Two. He also argues that the mailings alleged in Counts Four and Seven were only incidental to the scheme and not for the purpose of executing it.

COUNT TWO.

On May 5, 1977, the defendant's insurance agent Steve Carter received a letter from S.F.O. which indicated that First Colony Life had made a tentative offer to insure Maurice Smith for $500,000. Accompanying this letter was a business reply postcard addressed to S.F.O. upon which Carter was to indicate whether the offer was acceptable or not. Carter testified that he obtained Moss's acceptance of the offer and marked the postcard accordingly. On May 9, Carter mailed the business reply postcard to S.F.O. Count Two charged the defendant with causing this mailing.

It is well established that a defendant may be found to have "caused" a mailing under the statute if the mailing was reasonably foreseeable to him. *Pereira v. United States, supra*, 347 U.S. at 8–9, 74 S.Ct. 358; *United States v. Minkin*, 504 F.2d 350, 353–54 (8th Cir. 1974); *United States v. Brown, supra*, 540 F.2d at 376. This is true even though the mailing emanates from a non-defendant. *Id.* Here, the evidence clearly established that the mailing alleged in Count Two was reasonably foreseeable to the defendant. As early as March of 1977 Moss was aware that Carter was seeking insurance from out-of-town insurance companies and that the mails were being used to assist the search. During that month, Carter gave Moss a trial application [11] for insurance through S.F.O. The trial application, which was in the form of a business mailer, clearly indicated that it was to be returned to S.F.O. through the mails. Moss obtained Smith's signature upon the application and returned it to Carter for submission to S.F.O. Thus, Moss was put on notice that the mails were being used to obtain insurance through S.F.O. This was sufficient evidence for the jury to find that the mailing alleged in Count Two was reasonably foreseeable to the defendant. *Cf. United States v. Minkin, supra.*

COUNT FOUR.

Count Four charged the defendant with causing the mailing of a letter from Wanda Davis of S.F.O. to Steve Carter on June 14,

---

11. A trial application is a form used to provide the substandard brokerage house with preliminary information concerning the proposed insured and the type of insurance sought. Once such an application is received by the broker, it is sent to the various insurance companies which are in the business of insuring the particular risk. On the other hand, a formal application for insurance is sent by the brokerage house to the insurance agent only after an insurance company has extended an offer and a quote for insurance.

1977. The letter indicated that Moss's acceptance of the insurance offer had been approved by First Colony Life and that the policy was being issued. Defendant contends that this mailing was not done "for the purpose of executing the scheme" because the information contained in the letter had already been relayed to Carter by Davis over the telephone prior to Carter's receipt of the letter.

 While proof of a violation of 18 U.S.C. § 1341 requires that a defendant use the mails "for the purpose of executing" the deceptive scheme, the mailings need not be an essential element of the scheme. *Pereira v. United States, supra,* 347 U.S. at 8, 74 S.Ct. 358; *United States v. Nance,* 502 F.2d 615, 618 (8th Cir. 1974). However, there must be evidence that the mailings are "sufficiently closely related" to the scheme, *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), or "incident to an essential part of the scheme", *Pereira v. United States, supra,* 347 U.S. at 8, 74 S.Ct. at 363; *United States v. Brickey,* 296 F.Supp. 742, 748 (E.D.Ark. 1969), *aff'd,* 426 F.2d 680 (8th Cir. 1970); *United States v. Rauhoff,* 525 F.2d 1170, 1176 (7th Cir. 1975). The evidence produced in the instant case established the requisite connection. Although the confirmation letter may not have been necessary from Moss's point of view, the mailing facilitated the handling and processing of the insurance application and policy. The letter was mailed in the regular course of business associated with the issuance of insurance policies. Under these circumstances the jury was entitled to find that the mailing was incident to an essential part of the scheme and sufficiently closely related thereto so as to bring the defendant's conduct within the statute. *See United States v. Owen,* 492 F.2d 1100, 1103 (5th Cir.) *cert. denied,* 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 292 (1974).

**COUNT SEVEN.**

██ Count Seven charged the defendant with causing the mailing of the amendment to the insurance policy to S.F.O. on July 1, 1977. Defendant contends that this mailing was not done "for the purpose of executing" the scheme because the insurance policy had already been issued and the amendment was merely for the information of the owner of the policy. However, defendant overlooks the testimony of two representatives of First Colony Life that the amendment was an integral part of the policy which had to be signed by the applicant and the proposed insured and then returned to the company before the policy was considered in effect.[12] Clearly, the evidence is sufficient to establish that this mailing was done for the purpose of executing the deceptive scheme.

**IV. Nondisclosure by Juror During Voir Dire.**

Defendant also contends that he was denied his sixth amendment right to a fair trial due to the failure of a juror to affirmatively respond to a question put to the panel of jurors by the court during voir dire. The court asked the prospective jurors whether they were "personally acquainted with Mr. Godfrey (defendant's counsel) in any way whatsoever" and whether they had "ever known him as a friend, an acquaintance, socially, or as an attorney?" There was no affirmative response from any of the members of the panel. After the trial, and after filing a motion for a new trial defendant's counsel learned through a check of his files that the wife of one of the jurors was the ex-wife of one of his clients and that she had been an adversary in a contested child custody case he had handled nine years earlier. Defendant's counsel requested a hearing to examine the juror. At the hearing, the juror testified that he had had no prior recollection of defendant's counsel during the trial. The defense produced documentation that,

---

**12.** The amendment to the policy was necessary because the policy as issued differed from that which Moss had originally applied. The issued policy contained an extra premium charge to which Moss had yet to give his approval.

nine years earlier, the juror had been present in the courtroom during the custody suit and had also been present at the office of the defendant's counsel during a deposition by him.

■ The function of voir dire is to implement the constitutional guarantee of an impartial jury, a fundamental right of our system of criminal justice. To this end, every juror has the duty to answer questions affecting his qualifications honestly. If it appears that a material nondisclosure by a juror "resulted from a purposefully incorrect answer or from deliberate concealment", the court must grant a new trial. *Daniels v. United States*, 123 U.S.App.D.C. 127, 131, 357 F.2d 587, 591 (1966); *Carpenter v. United States*, 69 U.S.App.D.C. 306, 100 F.2d 716, 717 (1938); *Williams v. United States*, 418 F.2d 372, 377 (10th Cir. 1969). In the instant case, however, there is absolutely no evidence to suggest that the juror's nondisclosure of his slight acquaintance with defendant's counsel nine years ago was anything but innocent or inadvertent. Furthermore, it appears that an associate of defendant's counsel passed him a note during voir dire suggesting what they later learned to be true about the juror. However, no effort was undertaken to verify their suspicions until after the trial three weeks later. Under these circumstances, we cannot say that the defendant was denied a fair trial. The trial court did not abuse its discretion in denying defendant's motion for a new trial.

## V. Witnesses.

Defendant maintains that the trial court erred when it refused to allow witnesses Taylor and Theodore to testify as to certain statements uttered by Bernard Steinger concerning his proposed Japan trip. The trial court expressly found, and we agree, that the defendant failed to establish the "circumstancial guarantees of trustworthiness" required for the admission of such statements under Fed.R.Evid. 804(b)(5). See *United States v. Carlson*, 547 F.2d 1346, 1354 (8th Cir. 1976).

■ In addition, defendant claims that the trial court erred when it excluded the testimony of witnesses Chambers and Lewis who would have testified that during January 1978, Lt. Dempsey approached them and offered to "rough somebody up." The defendant sought to introduce this testimony in connection with an entrapment defense. We hold that the trial court committed no prejudicial error in excluding this testimony which concerned collateral acts occurring almost three months after the arrest of the defendant. We also find no merit to defendant's contention that the trial court improperly limited his recross-examination of Maurice Smith as to his prior arrests.

## VI. Excessiveness of the Sentence.

■ Finally, defendant argues that the consecutive two-year terms he received on the eighteen counts of mail and wire fraud are excessive. The rule in this court is that "[a] sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review." *Woosley v. United States*, 478 F.2d 139, 141 (8th Cir. 1973) (en banc). Here, each count carried a maximum possible punishment of five years imprisonment. Moss's sentence, therefore, was well within the statutory limit. We note, however, that defendant may still seek reduction of his sentence under Rule 35, Federal Rules of Criminal Procedure.

■ The consecutive sentences on the mail fraud counts initially ran concurrently with a life sentence on the conspiracy-murder conviction. Because the life sentence has been set aside, the propriety of consecutive sentences for separate mail fraud offenses arising out of essentially a single scheme should be reconsidered by the district court in a Rule 35 proceeding.

The judgment of conviction on Counts Two through Nineteen is affirmed; the judgment of conviction on Count One is ordered reversed and the cause is remanded with direction to enter a judgment of acquittal.