**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Leonard L. DREYFUS, Defendant-Appellant.**

No. 75–1673.

United States Court of Appeals, Fifth Circuit.

March 19, 1976.

---

Milton E. Brener, New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Mary Williams Cazalas, Asst. U. S. Atty., New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, SIMPSON and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Defendant Leonard L. Dreyfus was indicted on twenty-two counts[1] for alleged violations of 18 U.S.C. § 1010,[2] knowingly filing false statements with the Department of Housing and Urban Development (HUD) for the purpose of obtaining mortgage insurance, in connection with the construction of the Law-

1. SUPERSEDING INDICTMENT FOR FALSE STATEMENTS

The Grand Jury charges that:

1. On or about the dates hereafter listed, in the Eastern District of Louisiana, LEONARD L. DREYFUS, in order to obtain mortgage insurance from the United States Department of Housing and Urban Development/Federal Housing Administration, (hereinafter referred to as HUD/FHA), for the Lawrence Creek Apartments, Project No. 064–35099, did knowingly, willfully, and unlawfully, make, utter, and publish a statement, knowing the same to be false, in that on each of the following dates, the defendant submitted to HUD/FHA, FHA Form 2403, certifying that the following sums of money had been paid project architects when, in truth and fact, he knew that the sums listed had not been paid to the project architects.

2. The allegations of paragraph "1" hereof are repeated and realleged for Counts 1 through 19 of this indictment as though fully set forth therein:

| Count | Advance No. | Date Submitted | Amount to Architect |
|---|---|---|---|
| 1 | Initial | 11–24–71 | $153,570.00 |
| 2 | 2 | 2– 8–72 | 2,450.16 |
| 3 | 3 | 3– 1–72 | 2,501.20 |
| 4 | 4 | 3–29–72 | 3,011.66 |
| 5 | 5 | 4–26–72 | 4,543.00 |
| 6 | 6 | 5–22–72 | 5,053.64 |
| 7 | 7 | 6–26–72 | 5,819.13 |
| 8 | 8 | 7–21–72 | 4,543.00 |
| 9 | 9 | 8–25–72 | 2,705.39 |
| 10 | 10 | 9–29–72 | 2,960.61 |
| 11 | 11 | 11– 1–72 | 2,603.29 |
| 12 | 12 | 11–22–72 | 1,684.49 |
| 13 | 13 | 1– 9–73 | 3,317.93 |
| 14 | 14 | 1–31–73 | 1,990.75 |
| 15 | 15 | 2–26–73 | 2,501.20 |
| 16 | 16 | 3–23–73 | 1,684.49 |
| 17 | 17 | 4–19–73 | 1,378.21 |
| 18 | 18 | 5–30–73 | 1,582.40 |
| 19 | 19 | 8–10–73 | 2,143.88 |

all in violation of Title 18, United States Code, Section 1010.

COUNT 20

On or about the 4th day of December, 1973, in the Eastern District of Louisiana, LEONARD L. DREYFUS, in order to obtain mortgage insurance from HUD/FHA for the Lawrence Creek Apartments. Project No. 064–35099, did knowingly, willfully, and unlawfully, make, utter, and publish a statement knowing the same to be false, in that he submitted to HUD/FHA, FHA Form 2330, "Mortgagor's Certificate of Actual Cost", and related attachments, which said form and attachments certified that all rebates, trade discounts, and promotional or advertising allowances, had been either deposited in the residual receipts, reserve for replacement accounts, or applied as a reduction of the insured mortgage, when, in truth and fact, he knew that a $71,820 rebate from New Orleans Public Service, Inc. had not been credited to the project in any way, all in violation of Title 18, United States Code, Section 1010.

COUNT 22

On or about the 28th day of May, 1972, in the Eastern District of Louisiana, LEONARD L. DREYFUS, in order to obtain mortgage insurance from HUD/FHA for the South Park Apartments, Project No. 064–35082, did knowingly, willfully, and unlawfully, make, utter, and publish a statement, knowing the same to be false, in that he submitted to HUD/FHA, FHA Form 2330, "Mortgagor's Certificate of Actual Cost", and related attachments, which said form and attachments certified that all rebates, trade discounts, and promotional or advertising allowances, had been either deposited in the residual receipts, reserve for replacement accounts, or applied as a reduction of the insured mortgage, when, in truth and fact, he knew that a $20,800 rebate from Gulf States Utilities had not been credited to the project in any way, all in violation of Title 18, United States Code, Section 1010.

2. 18 U.S.C. § 1010 provides:

Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

rence Creek Apartments in New Orleans and the Southpark Apartments in Baton Rouge. Prior to trial, the United States Attorney dismissed Count 21. The remaining twenty-one counts were tried before a jury from January 27, 1975, to February 3, 1975. A guilty verdict was returned on all twenty-one counts. The defendant was sentenced to serve eighteen months imprisonment for each count, the sentences to run concurrently. Execution of the sentences was suspended, and he was placed on probation for three years. As a condition of probation, the court ordered that Dreyfus render thirty days of public service during every year of probation. He was also fined $1,200 for each count for a total of $25,200. The defendant appeals, challenging the sufficiency of the evidence and the adequacy of the instructions in regard to all twenty-one counts.

For the purposes of analysis, the twenty-one counts readily divide into three groups. The first group consists solely of Count 1 which alleges that the defendant, in his capacity as a partner of Lawrence Creek Associates, submitted to HUD a written certification stating that Lawrence Creek Associates had paid $153,750 to Dreyfus in his capacity as design architect, knowing that he had not paid himself that sum of money. The second group consists of Counts 2–19; these counts all allege that the defendant, for purposes of obtaining mortgage insurance, knowingly submitted false certificates of monthly payments to the supervisory architect in excess of the amount actually paid. The third group consists of Count 20 and Count 22 which both allege that the defendant knowingly submitted a false statement of the final cost of the Lawrence Creek Apartments and the Southpark Apartments because he failed to account for promotional allowances from utility companies.

## I.

Defendant Leonard L. Dreyfus and his partner Marcus Hirsch have worked together developing real estate since 1963. Prior to beginning either the Southpark or Lawrence Creek Apartments, they built approximately fifteen projects utilizing private financing. In those projects, as well as the HUD projects that are the subject of this litigation, the partners performed a multiplicity of functions. They did their own design work, Mr. Dreyfus functioning as the design architect and Mr. Hirsch functioning as the mechanical engineer. They also were the primary construction contractors and purchased building materials from their own supply company. In addition, the defendant, an experienced lawyer as well as an architect, presumably relied on his own legal advice in the construction of the privately financed projects, as he later did in the publicly financed ones.

In 1970, Dreyfus and Hirsch applied for and received HUD approval of the Southpark project in the Baton Rouge area. Dreyfus and Hirsch would function, as approved by HUD, not only as owner-developers, but also as design architects and as primary contractor through Landmark Construction Company, a Dreyfus and Hirsch partnership. HUD approved this "identity of interest" situation. In 1971, HUD approved the application of Dreyfus and Hirsch to build the Lawrence Creek Apartments in New Orleans, once again approving an identity of interests situation.

The financing of both projects was arranged under the HUD 221(d)(4) program.[3] Under that program, financing is obtained from private sources at a market rate of interest, in this case from Pringle Mortgage Company, but the loan is guaranteed by HUD. To protect itself against potential liability resulting from a failing project, HUD involves itself in the development of the project in a variety of ways. HUD personnel pass upon all plans, approve or disapprove costs both initially and at the conclusion of the project, and generally oversee all aspects of development. HUD procedures

---

**3.** *See Generally,* 24 CFR § 221.

for overseeing these types of projects necessarily generate a great deal of paperwork on the part of the developers. To insure the reliability of the papers filed with HUD, Congress passed 18 U.S.C. § 1010. The charges against defendant Dreyfus are based on twenty-one allegedly false statements filed with HUD in contravention to that statute.

## II.

Count 1 was apparently the most significant count at trial. That count involved more money than the other twenty counts combined, and a reading of the record leaves the distinct impression that it generated more testimony than all the other counts combined. The count arises from the "Mortgagor's and Architect's Certificate," Exhibit G–1A. The allegedly false statement contained therein is:

> That Lawrence Creek Associates, a joint venture composed solely of Leonard L. Dreyfus and Marcus M. Hirsch, the mortgagor, has paid Leonard L. Dreyfus, the architect, in cash, the sum of $153,750 on the 24th of November, 1971, this amount representing the first payment on the account of the architect's fee.

The government presented alternative theories on this count. One theory was that the money was never paid out at all. The other theory was that the money was paid but that Dreyfus split it with Marcus M. Hirsch. The defendant's theory was that the fee was paid and split with Hirsch, but that there is nothing illegal about the design architect splitting his fee with his partner who served as design engineer on the project.

The problems presented by this count are an almost inevitable result of allowing an identity of interests situation. Even if viewed in a light most favorable to the government, the heart of the government's complaint is not an allegation of misappropriation of funds, but an allegation that paper was improperly shuffled. HUD approved the figure of $153,750 for design fees with full knowledge that an identity of interests existed between the architect and the developer. In such a situation, the agency certainly would not expect the developer to persuade himself, as architect, to work for less. HUD also admits that if the defendant in his role as developer had written a check to himself as architect, he could then dispose of the money however he pleased. If at that point, he had re-deposited the money into the developer account, the agency would have no objections.[4] Rather than going through such futile paper shuffling, he merely left the money in the developer account and applied it to such uses as he saw fit.

We believe that HUD can expect such meaningless gestures only if it gives the most explicit sort of instructions. Neither the language used on the form nor the regulations cited from the HUD Handbook entitled "Cost Certification Guide for Mortgagors and Independent Public Accountants,"[5] would have put the defendant on notice that he might have been doing something illegal. In an identity of interests situation, the developer-architect has "paid in cash for design [and] architectural services"[6] when he deposits the check from the mortgagee into his developer account. Accordingly, the conviction on Count 1 must be reversed because the statement filed by Mr. Dreyfus was not false.

## III.

Counts 2 through 19 present a much different problem than Count 1. While the primary issue presented by Count 1 was whether a false statement had been

---

4. Since a developer-architect can obtain the maximum approved fee by going through this ritual, HUD must already be relying on its initial approval of a maximum amount as its safeguard against excessive design costs. There is no conceivable system under which the developer-architect could or should be expected to voluntarily charge less than the approved maximum allowable amount.

5. FHA G4200.1.

6. *Id.* at lines 2A–B.

made, in Counts 2 through 19 the defendant concedes that the statements were false and that he knew them to be false. To violate 18 U.S.C. § 1010, however, a defendant must not only make a false statement knowing it to be false, but he must also have made the false statement for the purpose of influencing HUD to issue mortgage insurance. *Gevinson v. United States,* 358 F.2d 761 (5th Cir.), *cert. denied,* 385 U.S. 823, 87 S.Ct. 51, 17 L.Ed.2d 60 (1966).

The defense to these counts is aimed at this third element, that the misstatements were not made for the purpose of influencing HUD to issue additional mortgage insurance. Two consistent theories are promulgated by the defendant in support of this position. First, the defendant contends that the magnitude of the overstatement of expense was so small that his accountant advised him not to concern himself with it until the time of final cost certification when the exact amount paid would be entered. In addition, the defendant points out that he could legally have claimed a much larger sum at any time during the construction, and, therefore, lacked motive to overstate this very small item for purposes of accelerating his receipts of mortgage insurance.

When there is an identity of interests between the developer and the design architect, HUD requires that another architect, unaffiliated with the developer, be hired to serve as supervisory architect during the construction period. HUD approved a maximum supervisory architect fee of approximately $51,000, and a contract was submitted to HUD in that amount signed by Dreyfus and by Charles Dellsperger, the supervisory architect. Dreyfus and Dellsperger, however, had already entered into a contract calling for payment of only $1,000 per month for supervisory architectural services, and that was the amount actually paid to Dellsperger.

During the course of the project, Dreyfus would apply to Pringle Mortgage Company and HUD for partial payments based on the percentage of the project actually completed. Although Dreyfus would sign the form that was submitted to HUD for approval of each of these payments, part of the form was filled out by the Mortgage Company after Dreyfus had signed it. Among the items filled in by the Mortgage Company was the amount paid to the supervisory architect. The figure filled in by Pringle always was the percentage of $51,000 equal to the percentage of the project completed during that payment period. When Dreyfus received a copy of the first form submitted to HUD, he discussed this discrepancy with his accountant, Mr. Phillip Thorpe. Thorpe, who was experienced in handling HUD projects, testified that he advised Dreyfus not to worry about the discrepancy because it amounted to less than 1% of the partial payment and that it would be corrected with the filing of the final cost certification at the completion of the project. Appendix at 837. The final cost certification did in fact reflect the amount actually paid, not $51,000. Thus, the misstatements affected only the timing of payments, not the total cost of the project.

In addition to arguing that he acted without purpose because he was following the advice of his accountant, the defendant based his defense on lack of motive to falsify these figures for purposes of obtaining mortgage insurance. There was uncontroverted testimony that Dreyfus could have legally obtained larger advances in either of two ways. First, he could have increased his estimate of the percentage of the project completed. All witnesses on the subject agreed that he could have increased his estimate of the percentage of the project completed by 1% without any opposition from HUD or the Mortgage Company. By saying, for example, that the project was 24% instead of 23% complete, he would have received an additional $80,-000 (Appendix at 318–20, 784–85), far more than the $32,000 prematurely advanced during the entire course of the project as a result of the excessive supervisory architectural fees. Second, he legally could have claimed for materials

stored on the site, but not yet utilized. It was the unrebutted testimony of the construction supervisor that such a claim could have been made for approximately $75,000 to $100,000 and that the HUD site inspector urged Dreyfus to collect that amount. Appendix at 316–17.

■ We believe that a jury could consider either of these defenses, and should have been so instructed. While the instructions regarding the advice of an accountant were quite adequate, we believe the instructions regarding lack of motive were not. The trial judge instructed the jury that the relatively small size of the misstated amount and the fact that the defendant could have claimed much more for materials stored on the job site were immaterial to the consideration of whether or not the statements were in fact false. Appendix at 679. He added that failure to claim the additional materials "may be considered by you along with all other facts and circumstances in the case, as shown by the evidence, in determining the *good faith* of the defendant in submitting the alleged false statement." (Emphasis added.) Appendix at 680. This statement was followed by an abstract discussion of specific intent.

■ Dreyfus attempted to prove lack of purpose by introducing circumstantial evidence of lack of motive. This is a subtle defense; it is not one that is easily grasped by jurors and therefore requires very carefully drawn instructions. The instructions relative to this evidence emphasized first of all what it could not be used for, proof that the statements were not false. While those instructions were not wrong, they should have been accompanied by a careful explanation that the small size of the error and the ability of the defendant to receive larger advances by claiming materials on the site or a larger percentage of completion could be considered by the jury to determine whether or not the defendant submitted the statements *for the purpose of obtaining mortgage insurance*. Instead, the court only mentioned the unclaimed materials and said that the failure to claim the materials could be used to determine the "good faith" of the defendant. This discussion is the only time in the instructions that the term "good faith" is used, and it is, therefore, misleading to a jury that might not realize that he was referring to the "purpose" element of the offense.[7] Precision of language is essential when dealing with as subtle a concept as specific intent especially when met by a defense of lack of intent which is based on circumstantial evidence. The general instructions that follow about specific intent do not correct this error. The instructions concerning the "purpose" element of the crime should have been explicit, and should have been explained in terms of the evidence presented in the case.

### IV.

Counts 20 and 22 of the indictment allege that the defendant failed to adjust the final cost certification to reflect promotional allowances received from utilities companies for making the Lawrence Creek Apartments and the Southpark Apartments "all-electric."

The defendant admits that he received a promotional allowance in the amount of $20,800 from Gulf States Utilities in 1972 in connection with the Southpark Apartments. He also admits that this amount was not accounted for in his final cost certification, but denies he was making a knowing misrepresentation. He argues that the form called for "deduction of all kick-backs, rebates, adjustments, [and] discounts" but makes no mention of promotional allowances, the designation used by the utilities companies. Exhibit G–22. The defendant further contends that this mistake was a reasonable one, as evidenced by HUD's recognition in August, 1972, of the need to clarify their requirements by issuing a

---

**7.** Moreover, the court does not even go so far as to make a "good faith" instruction regarding the relatively small amount involved and the ability of the defendant to claim a larger percentage of completion.

new form that contained language including the phrase "promotional allowance." Mr. Sears, the government's expert witness from HUD, testified that the purpose of this additional form "was to call attention to the people of the fact· these things were considered as rebates. They are covered by the form 2330, but we knew, also, that some of the people were getting in trouble through ignorance or deliberately, so we required an additional certification." Appendix at 798. Upon receipt of the new form, the defendant's accountant filed a copy of the form executed by Marcus Hirsch along with a letter pointing out the promotional allowance in question and explaining its intended disposition.

This disposition of the promotional allowance followed the advice of their accountant, Mr. Thorpe, by crediting it to the owner's account to be used to reduce future utility operating costs. HUD disallowed that item, calling it a recovery of construction costs. (Appendix at 855.) Accordingly, the amount was deducted from the final cost certification.

When the Lawrence Creek Apartments were cost certified approximately a year later, the defendant treated a promotional allowance in the amount of $71,820 from New Orleans Public Service, Inc., as a reduction in construction costs. He used it specifically to reduce the cost of Landmark Construction Company's cost of constructing the apartments by reducing the line item "electric trade items." (Appendix 853.) This reduction was more than overcome by cost overruns, thus not reducing the total amount of mortgage insurance required. Defendant believed this treatment consistent with the treatment of the previous promotional allowance by HUD. He

argues that, even if this treatment presented the disposition of the promotional allowances, the misrepresentation clearly was not willful. The first promotional allowance was accounted for in a manner recommended by his accountant and was explicitly called to HUD's attention with the filing of the supplementary form; the second was accounted for in a manner that the defendant believed was mandated by HUD's ruling on the first allowance.

■ Thus, the defendant made out an argument for lack of intent that the jury could accept or reject. We believe, however, that in light of the erroneous inclusion of Count 1 in the indictment and trial, the defendant was prejudiced in his ability to present defenses to Counts 20 and 22, as well as 2 through 19. These counts were presented by the government as part of a large scheme to defraud HUD through the filing of false statements. Count 1 not only involved more money than the other twenty counts combined, but also was the subject of more testimony than either of the other two groups of counts. Moreover, much of the testimony in support of that count was of a highly prejudicial nature. Discussion of the splitting of architectural fees, lawyers fees and possible income tax violations all entered the record in an attempt to prove Count 1. None of those occurrences would have been relevant to any of the other counts, and, therefore, a new trial would present the defendant in a very different light.[8] In a case such as this one, where the jury must infer from circumstantial evidence the presence or absence of illegal purpose, all that testimony may have swung the verdict.

---

8. *Compare Chubet v. United States*, 414 F.2d 1018 (8th Cir. 1969); *United States v. Eagleston*, 417 F.2d 11 (10th Cir. 1969), and *Ward v. United States*, 110 U.S.App.D.C. 136, 289 F.2d 877 (1961) (motion of conspirator to be severed must be granted when additional counts with which defendant is unconnected are alleged against co-conspirators) *with United States v. Laca*, 499 F.2d 922, 924–25 (5th Cir. 1974) (motion to sever need not be granted when co-defendant is charged with counts with which movant is not charged if all were involved in same transactions or series of transactions) and *United States v. Weiss*, 491 F.2d 460 (2d Cir. 1974), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (even if joinder was illegal, no prejudice resulted because the evidence would still have been admissible against the defendant).

When an appellate court rules that certain counts should never have been put before a jury, it must not be unmindful of the potential for confusion in the minds of the jurors.[9] In a case such as this one in which the trial was spread out over more than a week and involved complex business transactions and subtle points of law, the potential for confusion is great. In light of all of these factors, we must conclude that a new trial should be granted as to Counts 2 through 20 and 22.

Accordingly, we REVERSE as to Count 1 and REMAND Counts 2 through 20 and 22 for further proceedings in light of this opinion.

---

**9.** *See United States v. Roach,* 321 F.2d 1 (3d Cir. 1963). The jury deliberated on subjects not properly before it because of the presence of a count that was not a crime. The court found the degree of prejudice beyond calculation, and ordered a new trial. *Cf. United States v. Berlin,* 472 F.2d 1002 (2d Cir. 1973), in which the court ruled that the acquittal on some counts and the admissibility of the evidence on the proper counts, render the error of charging defective counts harmless.