UNITED STATES of America, Appellee,

v.

Lloyde W. RICHMOND, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Rodney J. RICHMOND and Elwood P. Richmond, Appellants.

UNITED STATES of America, Appellee,

v.

RICHMOND ENGINEERING, INCORPORATED, Appellant.

Nos. 82–1257 to 82–1259.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1982.

Decided Feb. 28, 1983.

Ralph F. Carter, Degnan, McElroy, Lamb, Camrud, Maddock, & Olson, Ltd., Grand Forks, N.D., for Richmond Engineering, Inc. and Lloyde Richmond, Sr.

Robert Vogel, Grand Forks, N.D., for Rodney J. Richmond and Elwood P. Richmond.

Bruce E. Bohlman, Murray, Olson, Larivee, Bohlman & Engen, Ltd., Grand Forks, N.D., for Lloyde Richmond, Jr.

Rodney S. Webb, U.S. Atty., Lynn E. Crooks, Asst. U.S. Atty., Fargo, N.D., for appellee.

Before ROSS, McMILLIAN and ARNOLD, Circuit Judges.

ROSS, Circuit Judge.

Appellants, Lloyde W. Richmond, Jr., Rodney J. Richmond, Elwood P. Richmond and Richmond Engineering, Inc., were indicted on ten counts of making false statements in violation of 18 U.S.C. § 1001 (1976).[1] In addition, all individual appellants were indicted on one count of conspiracy to commit the violations charged in counts 1 through 10. See 18 U.S.C. § 371 (1976). Counts 1 through 9 involved false statements made in invoices submitted to various governmental bodies; count ten essentially involved concealing material facts in construction plans and specifications submitted to a federal agency for funding. On December 19, 1981, after a nineteen day trial, a jury found all appellants guilty on six counts of making false statements (counts 1 through 6) and found all individual appellants guilty on the conspiracy count relating to those substantive counts. Only appellants Lloyde Richmond, Jr. and Richmond Engineering, Inc. were found guilty on count ten.[2] The district court[3] entered judgments of conviction in accordance with the jury verdict on February 8, 1982.

Appellants have raised numerous issues on appeal including challenges to the jury instructions, evidentiary rulings, and the sufficiency of the evidence. For the reasons set forth herein we reverse the convictions of all appellants on the count eleven conspiracy charge, and reverse the convictions of appellants Rodney Richmond and Lloyde Richmond, Jr. on the false statements counts 1 through 6. The remaining judgments of conviction are affirmed.

I. *General Background*

The individual appellants, along with their father, Lloyde Richmond, Sr., are the principle owners, officers and management employees of Richmond Engineering, Inc., a construction engineering consulting firm in Grand Forks, North Dakota. In addition to providing services to private clients, the firm has represented several cities and counties in North Dakota. Lloyde Richmond, Sr. is the president of the corporation and has been primarily responsible for the billing of accounts. He is also a registered engineer and has served as the city engineer in cities like Grafton, North Dakota, or as a consulting engineer in various counties. Lloyde Richmond, Jr., a registered engineer, is the secretary of the corporation and has primarily worked as the chief design engineer. Rodney Richmond, a registered engineer and vice-president of the corporation, has been primarily involved in the corporation as a field engineer responsible for field inspections. Elwood Richmond is the treasurer of the corporation and has been primarily involved with the office management functions of the corporation, including bookkeeping and the billing process.

Count ten, on which only Lloyde Richmond, Jr. was convicted, was based on events arising out of a flood in Grafton, North Dakota, in 1979. As a result of a flood, the city sought funding assistance from the Federal Emergency Management Agency (FEMA) to repair damage to

---

1. 18 U.S.C. § 1001 provides:
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. Lloyde Richmond, Sr., a codefendant, president of the corporation, and father of the appellants, was acquitted on all counts.

3. The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota.

streets. Apparently, during late 1979 and early 1980 a question existed as to exact areas that would be eligible for federal funds. Richmond Engineering, Inc. represented the city in its application for funding, and Lloyde Richmond, Jr. was primarily involved in the application process and preparing the plans, specifications, and bidding forms relating to the Grafton street repair project. Although the details surrounding count ten will be discussed in greater detail below, essentially the government's charge under 18 U.S.C. § 1001 of "willful and knowing concealment" in relationship to this project was based on the fact that two sets of plans had been prepared by Richmond Engineering. One set of plans, upon which contractors' bids were based, contained repair work on areas that were ineligible for FEMA funding; another set of plans, which was submitted to FEMA in the city's application, did not contain the ineligible work areas.

Counts 1 through 6, on which all appellants were convicted, arose out of a federal investigation of Richmond Engineering which commenced in July 1980. Under Richmond's accounting system, invoices submitted to Richmond customers were generally prepared by Lloyde Richmond, Sr. from time summaries. These summaries were generally prepared by Elwood Richmond from the individual timecards submitted by Richmond's employees. Hours entered on timecards were used as a basis for employees' paychecks. In addition, hours worked on specific projects were extracted from the timecards and placed in the appropriate project time summaries.

The government audit revealed discrepancies between the hours entered on the individual timecards and the hours charged to specific project time summaries and eventually billed to customers. Among the discrepancies uncovered were: (1) hours entered on time summaries which were not supported by any timecards; (2) differences between the amount of time charged to projects on employee timecards and the amount of time charged on the project summary sheet; (3) hours entered on timecards for work on one project which were as-

signed to a different project on time summaries; (4) hours entered for one project on timecards being billed to two different projects on the summaries. According to the government's evidence, the discrepancies involving at least partially federally funded projects in counts 1 through 6 resulted in a total overcharge of $13,217.59.

## II. Analysis

### A. Jurisdiction of Federal Agency

■ Appellants maintain that their motions for directed verdicts of acquittal on counts 1, 3, 4, 5, and 6 should have been granted by the trial court because the government failed to prove that these counts involved false statements made in "any matter within the jurisdiction of any department or agency of the United States" as required in 18 U.S.C. § 1001. Appellants note that all invoices were submitted to counties or cities and that the facts show that in the projects covered by these counts federal funds were not used to reimburse the counties for engineering fees (counts 1, 4, 5, and 6) or all federal funds had been expended prior to the time Richmond submitted its bill for payment (count 3). Apparently, appellants would have us hold that in order to be within agency jurisdiction for purposes of the false statements statute the false statements be must made directly to a federal agency and federal funds actually have to be used to pay the appellants. This is not the law.

"[T]he term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." *Bryson v. United States,* 396 U.S. 64, 71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969) (citations omitted). In order to fall within agency jurisdiction, it is not necessary that the false statement in a particular matter be presented directly to an agency of the United States. *See, e.g., United States v. Bass,* 472 F.2d 207, 212 (8th Cir.), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973); *Ebeling v. United States,* 248 F.2d 429, 434 (8th Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (1957); *United States v. Stan-*

ford, 589 F.2d 285, 297 (7th Cir.1978), cert. denied, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). It is sufficient if such a statement is made in some intended relationship to a matter that is within the jurisdiction of a federal agency. Ebeling v. United States, supra, 248 F.2d at 434; United States v. Hooper, 596 F.2d 219, 223 (7th Cir.1979). This court has construed agency jurisdiction as "the power to make final or binding determinations * * *, i.e., the power to adjudicate rights, establish binding regulations, compel the action or finally dispose of the problem * * *." Friedman v. United States, 374 F.2d 363, 367–68 (8th Cir.1967). See also United States v. Diaz, 690 F.2d 1352, 1357 (11th Cir.1982) (jurisdiction for purposes of section 1001 can be defined broadly as the power to act).

■ All federal-aid highway projects in counts 1, 3–6 involved Federal Highway Administration participation, with 50% or more of the costs of projects being paid by federal funds. Furthermore, the Administration had substantial supervisory authority over each project to insure that construction, safety and cost standards were met, and the failure to meet these standards in a project could result in the withdrawal of federal funding or other administrative action. See 23 U.S.C. §§ 101–156, 103; 23 C.F.R. §§ 1.37, 16.1–16.8 (1982); Record at VI, 156–58. See generally State Highway Commission v. Volpe, 479 F.2d 1099, 1112–14 (8th Cir.1973); Pennsylvania Department of Transportation v. United States, 643 F.2d 758, 762, 764 (Ct.Cl.), cert. denied, 454 U.S. 826, 102 S.Ct. 117, 70 L.Ed.2d 101 (1981). Because the statutory scheme of the Federal-Aid Highways Act clearly evidences the Administration's "power to make binding or final determinations" in matters relating to federal-aid highway projects, it cannot be seriously contended the agency jurisdiction for purposes of section 1001 was lacking.

### B. Materiality

For essentially the same reasons asserted in support of their argument that agency jurisdiction was lacking, appellants argue that any false statements made in connection with the projects involved in counts 1, 3–6 were not material. In addition, appellants assert that the trial court erred in failing to submit the issue of the materiality of the false statements to the jury. We reject appellants' contentions.

■ The question of the materiality of a false statement for purposes of 18 U.S.C. § 1001 is one of law to be determined by the trial court. United States v. Adler, 623 F.2d 1287, 1292 (8th Cir.1980); United States v. Hicks, 619 F.2d 752, 758 (8th Cir. 1980). See also United States v. McIntosh, 655 F.2d 80, 82 (5th Cir.1981), cert. denied, 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982). But see, United States v. Valdez, 594 F.2d 725, 729 (9th Cir.1979). To establish materiality of a false statement it is not necessary to show that a government agency actually relied on the statement, that the government suffered pecuniary loss as a result of the statement, or that the false statement was sufficient to induce a payment or benefit. United States v. Adler, supra, 623 F.2d at 1291; United States v. Hicks, supra, 619 F.2d at 754–55; United States v. Jones, 464 F.2d 1118, 1121–22 (8th Cir.1972), cert. denied, 409 U.S. 1111, 93 S.Ct. 920, 34 L.Ed.2d 692 (1973). Rather, materiality involves only the capability of influencing an agency's governmental functions, i.e., does the statement have a "natural tendency to influence or is it capable of influencing agency decision?" United States v. Adler, supra, 623 F.2d at 1291, quoting United States v. East, 416 F.2d 351, 353 (9th Cir.1969). See United States v. Cowden, 677 F.2d 417, 419 (8th Cir.1982); United States v. Voorhees, 593 F.2d 346, 349 (8th Cir.), cert. denied, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979); United States v. Lichenstein, 610 F.2d 1272, 1278 (5th Cir. 1980).

■ Applying these standards to the instant case, it is clear that the district court correctly determined that the allegedly false statements in counts 1, 3–6 were material. Appellants' argument that materiality is absent because the Federal Highway Administration funds were not actually

used to pay engineering fees in connection with the projects in counts 3, 4, and 6 (either because federal funds had been expended prior to the time the Richmond's invoice was submitted or the county had not yet been reimbursed by the government for engineering fees) misses the mark. As noted above, the test of materiality is whether a false statement has the abstract *capability* of influencing an agency's governmental functions, not whether it actually has influenced those functions. It cannot be seriously asserted that engineering fee invoices submitted and paid by counties, for which in the normal course of events reimbursement would be requested from the Federal Highway Administration, do not have such a capability.

With regard to counts 1 and 5 appellants argue an absence of materiality of any false statements based on the fact that the counties did not seek federal reimbursement of engineering fees paid to Richmond Engineering because federal funding in those projects was limited. However, appellants fail to recognize the potential effect an irregularity committed in one part of a partially federally funded project may have on other aspects of federal participation. As we noted in this opinion concerning agency jurisdiction, the government appears to have substantial supervisory authority to maintain the integrity of Federal-Aid Highway projects, and irregularities occurring in one aspect of the program could result in termination of federal funding or other administrative action. *See* 23 U.S.C. § 103; 23 C.F.R. §§ 1.37, 16.1–16.8 (1982); Record at VI, 156–58. Therefore, we conclude that the allegedly false statements involved in counts 1, 3–6 were clearly material.

### C. Sufficiency of Evidence

■ Appellants' challenges to the sufficiency of the evidence are reviewed under well established general principles. A conviction will be upheld if, taking the view most favorable to the government, there is substantial evidence to support the jury's verdict. *Glasser v. United States,* 315 U.S.

60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We give the government the benefit of all reasonable inferences that may be logically drawn from the evidence, *United States v. Cox,* 580 F.2d 317, 323 (8th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979), and which tend to support the action of the jury. *United States v. Burchinal,* 657 F.2d 985, 991 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981); *United States v. Fuel,* 583 F.2d 978, 980 (8th Cir.1978), *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979).

Furthermore, we are guided by the general rule that "it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Shahane,* 517 F.2d 1173, 1177 (8th Cir.), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). Finally, the essential elements of the charge may be proved by circumstantial evidence as well as direct evidence since circumstantial evidence is intrinsically as probative as direct evidence.

*United States v. Cox, supra,* 580 F.2d at 323 (citations omitted). However, a conviction arising from the jury's mere conjecture, speculation, passion, prejudice or sympathy cannot stand. *See United States v. Knife,* 592 F.2d 472, 475 (8th Cir.1979); *Curly v. United States,* 160 F.2d 229, 232 (D.C.Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

### 1. Conspiracy—Count Eleven

■ In order to establish a conspiracy under 18 U.S.C. § 371 the government must prove the existence of "an agreement to commit an offense or to defraud the United States, attended by an act of one or more of the conspirators to effect the object of the conspiracy." *United States v. Pintar,* 630 F.2d 1270, 1275 (8th Cir.1980). *See United States v. Skillman,* 442 F.2d 542, 547 (8th Cir.), *cert. denied,* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). This court has long recognized that the agreement need not be

formal or express, and that a tacit understanding may be sufficient to constitute a conspiratorial agreement. *United States v. Pintar, supra,* 630 F.2d at 1275; *United States v. McCarty,* 611 F.2d 220, 222 (8th Cir.1979), *cert. denied,* 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980); *Nilva v. United States,* 212 F.2d 115, 121 (8th Cir.), *cert. denied,* 348 U.S. 825, 75 S.Ct. 40, 99 L.Ed. 650 (1954). Moreover, because conspiracy by its very nature is often not susceptible of proof by direct evidence, the existence of an agreement may be inferred from circumstantial evidence, including the conduct of the alleged conspirators and circumstances indicating their concerted action toward a common unlawful goal. *See Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States, supra,* 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Pintar, supra,* 630 F.2d at 1275; *United States v. Moss,* 591 F.2d 428, 435 (8th Cir.1979); *United States v. Pelton,* 578 F.2d 701, 712 (8th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978).

 While it is firmly established that once the existence of a conspiracy is shown, even slight evidence connecting a particular individual to a conspiracy may be sufficient to sustain a conspiracy conviction, and the government need not prove that alleged conspirators had knowledge of every detail or phase of the conspiracy, *United States v. McCarty, supra,* 611 F.2d at 222, 223; *United States v. Fuel, supra,* 583 F.2d at 981, it is equally axiomatic that neither mere association with individuals engaged in illegal conduct nor mere knowledge of the existence or acquiescence in the object of a conspiracy is sufficient. *See United States v. Wrehe,* 628 F.2d 1079, 1085 (8th Cir.1980); *United States v. Moss, supra,* 591 F.2d at 435; *United States v. Brown,* 584 F.2d 252, 262–63 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979); *United States v. Fuel, supra,* 583 F.2d at 982. "There must exist some element of affirmative cooperation or at least agreement to cooperate in the object of the conspiracy." *United States v. Brown, supra,* 584 F.2d at 262, *quoting*

*United States v. Collins,* 552 F.2d 243, 245 (8th Cir.), *cert. denied,* 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977).

 Applying the foregoing principles to the evidence in the present case, including the principle that we must take the view most favorable to the government, we agree with appellants that the government has failed to prove beyond a reasonable doubt the existence of a conspiracy agreement or that appellants were participants in such a conspiracy. The government did not produce any direct evidence, e.g., statements or admissions of the appellants, which would indicate a common plan or agreement. *See United States v. Fuel, supra,* 583 F.2d at 981. Our review of the record discloses that the government gave little attention to proving the existence of a conspiracy in this case either in its questioning of the appellants or in its closing argument. Furthermore, the government did not produce sufficient circumstantial evidence, e.g., the conduct of the parties and attending circumstances, from which the existence of an agreement could be inferred.

To support its conspiracy charge the government primarily relies on the facts that (1) Richmond Engineering, Inc. was a small closely held family corporation in which all of the appellant-brothers were officers and were primarily responsible for the operation of the business; and (2) all appellants financially benefitted from the operation of the firm. However, this court has consistently held that such familial or business association *without more* is insufficient to establish the existence of or participation in a conspiracy. *See United States v. Pintar, supra,* 630 F.2d at 1276; *United States v. Wrehe, supra,* 628 F.2d at 1079, 1084–85; *United States v. Brown, supra,* 584 F.2d at 263; *United States v. Fuel, supra,* 583 F.2d at 981–82.

The evidence adduced at trial indicated that Elwood Richmond, along with his father, Lloyde Richmond, Sr., were responsible for handling the billing for the firm. Even assuming that Elwood intentionally

made false statements in preparing the billing summaries involved in counts 1 through 6, there was no evidence that Lloyde Richmond, Jr. or Rodney Richmond participated in those false statements, were significantly involved in the firm's billing process, or were aware of any discrepancies occurring in that process. *Cf. United States v. Pintar, supra,* 630 F.2d at 1276 (no evidence of actual involvement in or agreement to illegal object of conspiracy); *United States v. Wrehe, supra,* 628 F.2d at 1082–85 (same). In fact, the evidence generally established that each of the appellants were principally involved with a separate aspect of the business and that there was very little overlap in their activities or responsibilities. We are convinced that, even when the government is given the benefit of all reasonable inferences to be drawn from the facts, including the conduct of the appellants and the attending circumstances, the evidence in this case raises no more than a mere suspicion or possibility of a conspiracy. Such evidence is simply insufficient to establish the existence of a conspiracy or appellants' participation therein beyond a reasonable doubt. *See United States v. Blunk,* 561 F.2d 111, 116 (8th Cir.1977).

2. *False Statements in Invoices—Counts 1 through 6*

■ In accordance with well established conspiracy law, the trial court instructed the jury that if they found a defendant guilty of a conspiracy they could also find that defendant guilty of a substantive crime which was committed by his coconspirators pursuant to the conspiracy at the time the defendant was a member of the conspiracy.[4] *See Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Cox, supra,* 580 F.2d at 324. In light of the dearth of evidence directly implicating appellants Rodney Richmond and Lloyde Richmond, Jr. in the false statement violations charged in counts 1 through 6, it is apparent that the jury's guilty determination relating to Rodney and Lloyde on

these counts was based upon the conspiracy verdict on count eleven. In view of our holding that there was insufficient evidence to sustain the conspiracy convictions, and because even when the evidence relating to the false statements in invoices is viewed in the light most favorable to the government there is not substantial evidence to support the jury's finding of guilt as to Rodney Richmond and Lloyde Richmond, Jr., *see Glasser v. United States, supra,* 315 U.S. at 80, 62 S.Ct. at 469, we must reverse their convictions on counts 1 through 6.

■ However, we cannot reach the same conclusion with regard to appellant Elwood Richmond. It is essentially undisputed that Elwood Richmond was primarily responsible for preparing billing summaries involved in counts 1 through 6, and that discrepancies existed between those summaries (and the invoices prepared from those summaries) and the timecards from which they were prepared. The focal point of controversy was whether statements in the invoices were intentionally false, e.g., whether they were made "knowingly and willfully." 18 U.S.C. § 1001.

The government produced the testimony of Donald Bloyer, the government's auditor who investigated Richmond Engineering, Inc. Essentially, Bloyer testified that he audited the Richmond's billing system by employing a claim audit technique, i.e., tracing backwards through the system from invoices to the summaries from which those invoices were prepared and the timecards from which the summaries were prepared to determine if entries ultimately appearing on the summaries and invoices were supported by employee timecards. According to Bloyer, this audit resulted in the finding of unsupported charges (overcharges) of $13,217.59 on the invoices relating to the projects involved in counts 1 through 6. Bloyer testified that he found approximately 2000 mistaken entries in the Richmond billing records, and that about 53% of the entries on invoices were subject to some irregularity. Among the irregularities he

4. See Instruction 33.

found were: (1) costs charged to one project which should actually have been charged to another project; (2) time appearing on time summaries that was not traceable to any timecards; (3) time charged on summaries for employees whose timecards indicated that they were on vacation. In addition, the government introduced evidence tending to show that work actually done on private projects had been charged to federally funded projects, that at least one employee had been instructed by Elwood Richmond or Gary Thompson to enter project numbers on his timecards for projects on which he had not worked, that changes were made in the project numbers entered on employee timecards after they were submitted by the employees which conflicted with the employees' records concerning the projects upon which they had worked, and that time entered on employee timecards apparently had been used to support more than one billing summary.

Appellants introduced the testimony of their expert witness, David Riske, a certified public accountant who conducted an entitlement audit on Richmond's billing records, i.e., traced the entries on timecards to the invoices to determine if Richmond had billed projects for more than that to which it was entitled. While Riske did find discrepancies between timecards and weekly summaries, he concluded that on an entitlement basis, three of the invoices involved in counts 1 through 6 contained undercharges ($2034.64) and three invoices contained overcharges ($4040.26). According to Riske the total combined overcharges involved in counts 1 through 6 amounted to $2,005.62 on an entitlement basis.[5] Riske also testified that although Richmond's bookkeeping system lent itself to the commission of error there was no consistent pattern of error involved.

On cross-examination of the government's witness Bloyer, appellants elicited admissions that under Bloyer's auditing procedures hours which were entered on timecards but not found on the project summary sheets were not considered in determining supportable amounts on invoices. In addition, Bloyer conceded that there was not a requirement that timecards be kept to substantiate the amounts billed on invoices, that relatively few of the timecards had been altered so as to render them consistent with summaries, and that Richmond management clearly had the duty to correct errors by employees in preparing their timecards. Essentially, appellants maintain that the evidence showed that the irregularities or errors relating to the Richmond Engineering invoices included in the first six counts were not intentional, but were the result of the inadequacies of their bookkeeping system or were legitimate corrections of erroneous entries on employee timecards.

While our review of the record in the present case relating to counts 1 through 6 reveals substantial conflicts in the evidence relating to intent, it must be remembered that it is not for this court "to weigh the evidence or determine the credibility of witnesses." *Glasser v. United States, supra,* 315 U.S. at 80, 62 S.Ct. at 469. When the evidence is viewed in the light most favorable to the government we believe that there is substantial evidence to support the jury's verdict finding Elwood Richmond guilty of willfully and knowingly making false statements in violation of 18 U.S.C. § 1001.

### 3. *Flood Repair Project—Count Ten*

As a result of the city's dissatisfaction with the amount of flood related damage and geographical areas found to be eligible for Federal Emergency Management Agen-

---

**5.** It should be noted that in making his determination that Richmond Engineering actually charged less on three invoices than it was entitled to, Riske apparently applied the overhead rate which Richmond would have been entitled to under the contracts, rather than the overhead rate that Richmond actually used in pre-

paring the invoices. On cross examination Riske admitted that errors he found in the government's favor were a result of his audit methodology rather than the Richmond accounting system as it was actually used. *See* Record at XI, 38–39.

cy (FEMA) or Federal Highway Administration funding during the initial inspection in June 1979,[6] a reinspection of flood damage to streets in Grafton was conducted on April 10, 1980, by Jerry Cloud on behalf of FEMA. Among those accompanying Cloud were Lloyde Richmond, Jr. and Andy Stewart, a Richmond Engineering employee involved in the preparation of plans for the street repair project. The reinspection consisted primarily of revisiting the sites covered by the original DSR's to redetermine estimated quantities, types of materials required, and unit prices. In addition, several areas that were on the Federal Aid System were revisited. Generally, the eventual result of the reinspection was the reinstatement of the quantities and unit prices listed on the original DSR's and the confirmation that the streets on the Federal Aid System were not eligible for either FEMA or Federal-Aid Emergency Relief funding.

Sometime after Cloud's April 10, 1980 inspection but prior to June 2, 1980, two sets of construction plans and specifications were prepared by Richmond Engineering which both contained a May 27, 1980 certification date signed by Lloyde Richmond, Jr. A nineteen work area set of plans, which was given by Lloyde Richmond, Jr. to Tim Mayo, the contractor who successfully bid on the project, contained four geographical areas and other items that were ineligible for funding. Mayo used this set of plans as the basis for the bid he submitted on the project. Another set of plans, which was actually furnished by Richmond to FEMA on June 4, 1980, for funding review and approval, contained only fifteen geographical work areas and essentially matched the DSR's originally approved on the project.

Bids on the project were opened on June 2, 1980, and Mayo's low bid of $307,654.70 was found to be much higher than the estimates on the project. Nevertheless, Lloyde Richmond, Jr. recommended the acceptance of that bid. Upon receiving the bids and plans submitted by Richmond for review on June 6, 1980, FEMA rejected the bids and authorized Lloyde Richmond, Jr. to negotiate a reduction in the Mayo bid. Negotiations between Tim Mayo and Lloyde Richmond, Jr. were held in mid-June resulting in a reduction in the bid of $87,665. The purported reasons for the reduction involved changes in unit prices of some materials, reduction in some of the specifications, and an agreement that the city would provide some materials. On June 24, 1980, a meeting was held between FEMA officials, including Jerry Cloud, and city representatives, including Lloyde Richmond, Jr., to resolve the problem, and an agreement was reached to go ahead with the renegotiation of the Mayo bid. Consequently, a change order detailing the reduction in the Mayo bid was submitted by Lloyde Richmond, Jr. on July 7, 1980, and construction began on the project.

During an inspection on July 22, 1980, Jerry Cloud discovered the nineteen area set of plans on the Mayo construction site. Apparently, Richmond did not actually send Mayo the correct fifteen area set until late July. Although the project was completed on the basis of the fifteen area set of plans and the quantities therein, work on some of the areas ineligible for FEMA funding was done by the contractor and the city.

▄▄ Under count ten of the indictment, the government charged that in connection with this Grafton street repair project the appellants "willfully and knowingly concealed and covered up by trick, scheme and device a material fact" in preparing the two sets of plans. Only appellant Lloyde Richmond, Jr., who was primarily responsible for the preparation of the plans and specifi-

---

**6.** The basic documents involved in the FEMA inspection and application process were Damage Survey Reports (DSR's) prepared by a federal inspector. These DSR's delineated the geographical areas that would be eligible for federal funding and provided estimates of the quantities of materials that would be required to repair streets damaged by the 1979 flood.

Certain geographical areas actually visited during the initial inspection had been determined to be ineligible for FEMA funding because they were found to be on the Federal Aid System, and quantities of materials and unit prices listed on the original DSR's had been reduced after agency review.

cations, and Richmond Engineering, Inc. were found guilty on this count.

There is apparently no dispute concerning the basic facts recited above. Furthermore, Lloyde Richmond, Jr. admits that he did not inform FEMA of the existence of the nineteen area set of plans containing ineligible work areas and items. Instead, the factual dispute centers on whether the alleged concealment was intentional, i.e., knowing, willful and done with the intent to defraud. See 18 U.S.C. § 1001. In the context of the instant case, appellant Lloyde Richmond, Jr.'s intent must be determined from the facts and circumstances surrounding the appellant's actions during the street repair project, particularly the evidence relating to his knowledge concerning which areas and items were properly includable in the bids, project proposals, and plans submitted to FEMA.

Appellant Lloyde Richmond, Jr. essentially maintains that the dual set of plans resulted from innocent mistake, inadvertence, and confusion over which areas were properly includable in the plans for the street repair project. Generally, at trial he offered two explanations for the existence of the nineteen area set of plans. First, he maintained that he did not know that the Federal Aid System areas were not eligible until after the first set of plans had been prepared and given to Tim Mayo. In addition, he asserted that the city was planning a joint project involving federal and city participation, and that he had been advised that such a project was acceptable to the government.

However, the government introduced evidence and testimony from which the jury could have concluded that Lloyde Richmond, Jr. did have knowledge prior to the time Tim Mayo picked up the plans and specifications for the project that the Federal Aid System areas contained in the nineteen area set of plans were not includable in the FEMA project. Furthermore, the evidence, including Richmond's admissions, clearly established that prior to the time the contract bids were actually opened on June 2, 1980, and the bids, proposal and fifteen area set of plans were sent to FEMA for review Lloyde Richmond, Jr. knew not only that the Federal Aid areas were not eligible for FEMA funding, but that these areas had been found to be ineligible for Federal-Aid Emergency Relief. The record reveals that despite this knowledge, his awareness that Tim Mayo had the nineteen area set of plans upon which to base his bid and had been advised to bid material quantities on the basis of the plans, and Richmond's admitted belief that the bids came in too high, appellant recommended that the city accept Mayo's bid. Moreover, Richmond admitted that despite this knowledge he did not advise FEMA about the existence of the two sets of plans or the existence of a joint project either at the time the bids came in high and were rejected by FEMA or at the time of the June 24, 1980 meeting concerning a renegotiation of the bid. Richmond also testified that he did not mention the existence of the two sets of plans or the deletion of some work areas to Mayo during the renegotiation of the bid.

The government also introduced evidence that at least some of the reasons given for the $87,655 reduction in the bid price were unsupported. Jerry Cloud testified that a change in chip seal which - purportedly accounted for a reduction in the bid price of $46,755 actually only accounted for approximately $7500 to $8500. On cross-examination appellant generally did not dispute Cloud's analysis. Furthermore, Cloud testified that although there were other cost discrepancies between the two sets of plans, simply deleting the four ineligible areas from the nineteen area set of plans would account for almost $31,000 of the reduction in the bid price.

 Our review of the facts and circumstances disclosed in the record concerning appellant Lloyde Richmond, Jr.'s criminal intent, including the evidence alluded to above, convinces us that there was substantial evidence supporting the jury's finding that appellant willfully and knowingly concealed material facts in the Grafton street repair project in violation of 18 U.S.C. § 1001. Consequently, the convictions of

Lloyde Richmond, Jr. and Richmond Engineering, Inc. on count ten are affirmed.[7]

### D. *Theory of Defense Instruction*

Appellants assert that the trial court improperly refused their requested theory of defense instruction No. 11 which stated:

> You are instructed that the defendants contend that they had no motive to falsify any records or make any improper claims, because they had no reason to do so. They assert that they often charged less than the permissible amount of fees, and could have charged considerably more than they did with perfect legality (for example, by charging for the time spent on projects by supervising engineers, by charging for services not charged for, by negotiating contracts for a maximum 10% fee rather than a 6% fee, and the like) and that these facts show a lack of the specific intent which is an element of the crime charged.

> I charge you that such evidence as I have referred to is material, and can be considered by you in your determination as to whether the defendants had that specific intent which is an element of the crimes charged against them.

In place of this instruction, the trial court charged the jury in instruction No. 15 that:

> Intent and motive should never be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Personal advancement and financial gain are two well-recognized motives for much of human conduct. These laudable motives may prompt one person to voluntary acts of good, or another person to voluntary acts of crime.

Defendants contend they had no motive to falsify any records or make any improper claims because they had no reason to do so. Good motive is never a defense where the act done or omitted is a crime, but it may be considered by the jury in its determination of the state of mind or intent of an accused.

Appellants essentially maintain that the trial court's instruction misrepresented and inadequately covered the substance of their defense theory by its reference to "good motive." Instead, appellants contend that the position expressed by instruction No. 11 was that "criminal intent was negated by the fact that they could have legally charged more than they did for much of the work they did,"[8] i.e., that the evidence introduced at trial and referred to in their instruction went to lack of intent to falsify rather than to show good motive. According to appellants, the trial court's instruction No. 15 amounted to a refusal to give their theory of defense and essentially told the jury to disregard their evidence relating to intent. We cannot agree.

 It is firmly established that a defendant is entitled to an instruction on his theory of the case if a request is timely made and the proffered instruction is supported by the evidence and correctly states

---

**7.** With regard to its substantive convictions on count 10 and counts 1–6, appellant Richmond Engineering, Inc. argues that there was insufficient evidence to convict the corporation because the government failed to prove that there was any corporate scheme to defraud the government and there was no evidence that the individual defendants were acting in a corporate capacity when they made the allegedly false statements. Appellant also argues that to convict both the corporation and the individual defendants would constitute double punishment. Appellant's arguments have no merit. It is clear that a corporation may be prosecuted along with its officers under the 18 U.S.C. § 1001 false statement statute. *See, e.g., United States v. Cincotta,* 689 F.2d 238 (1st Cir.

1982); *United States v. Lange,* 528 F.2d 1280 (5th Cir.1976). Generally, a corporation is responsible for the criminal acts of its officers, agents, and employees committed within the scope of their employment and for the benefit of the corporation. *United States v. Cincotta, supra,* 689 F.2d at 241, 242; *United States v. DeMauro,* 581 F.2d 50, 53 (2d Cir.1978). The record in the present case clearly supports the conclusion that the criminal acts committed by Lloyde Richmond, Jr. in count ten and Elwood Richmond in counts 1–6 were done within the scope of their corporate authority and on behalf of the corporation.

**8.** Brief of Appellants at 67.

the law. *United States* ex rel. *Means v. Solem,* 646 F.2d 322, 328 (8th Cir.1980); *United States v. Manning,* 618 F.2d 45, 47–48 (8th Cir.1980); *United States v. Brake,* 596 F.2d 337, 339 (8th Cir.1979). However, it is equally well established that a defendant is not entitled to a particularly worded instruction and that the trial court has considerable discretion in framing the instructions. *United States v. Brown,* 540 F.2d 364, 380 (8th Cir.1976), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979); *United States v. Nance,* 502 F.2d 615, 619 (8th Cir.1974), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975). It is sufficient if the instruction actually given by the trial court adequately and correctly covers the substance of the requested instruction. *Id.; United States v. Deon,* 656 F.2d 354, 356 (8th Cir.1981); *United States v. Manning, supra,* 618 F.2d at 48. Finally, it must be remembered that the adequacy of the trial court's instructions is to be judged by considering the instructions as a whole. *United States v. Brake, supra,* 596 F.2d at 339; *United States v. Brown, supra,* 540 F.2d at 380; *United States v. Nance, supra,* 502 F.2d at 619–20.

■■■ An examination of the appellants' proposed instruction No. 11 reveals that the trial court did not err in construing the instruction as raising the issue of motive. The requested instruction essentially posits that the defendants had no motive to falsify, lists the evidence relating to lack of motive (as well as implying a good motive), and indicates that this evidence is material to the lack of specific intent. Although the trial court's instruction actually given to the jury is framed differently and correctly advises the jury that good motive, by itself, is not a defense to a crime, it does essentially present the jury with the substance of defendants' position that they had no motive to falsify any records and that evidence relating to motive can be considered in relationship to their intent or state of mind. It is true that the trial court's instruction does not actually specifically list the precise evidence relating to lack of motive and intent. However, this court has not required such specificity, and, in fact, has indicated that

instructions detailing the purported evidence and the inferences to be drawn from that evidence may not be acceptable. *See United States v. Nance, supra,* 502 F.2d at 619. *But see United States v. Dreyfus,* 528 F.2d 1064, 1070 (5th Cir.1976) (lack of purpose defense based on lack of motive should be explained in terms of evidence presented in case).

Moreover, an examination of all the instructions in the present case belies appellants' contention that the trial court effectively told the jury to disregard evidence proffered by appellant on specific intent. The court's instructions, other than instruction No. 15, specifically apprised the jury that the government was required to prove beyond a reasonable doubt that the crimes charged were committed with specific intent, that is, knowingly, willfully, and with the intent to defraud, and that the intent was to be determined from all the facts and circumstances in the case. It is clear that when all the instructions are read together, the jury was informed that the evidence relating to lack of motive (e.g., that defendants could have legally charged more) was to be considered in relationship to their specific intent.

While a more detailed defense theory instruction or perhaps different wording of the instruction might have been preferable, the test, as noted above, is whether the court's instructions, as a whole, adequately and correctly apprised the jury of the defendants' theory of the case, *see United States v. Nance, supra,* 502 F.2d at 619–20, and the failure to give a particular instruction does not require reversal in the absence of prejudice. *United States v. Brown, supra,* 540 F.2d at 581. We are convinced that such prejudice did not occur here. As we stated in *United States v. Brake, supra,* 596 F.2d at 339: "It is clear to us that the jury understood the defense theory and that under the instructions of the court defense counsel could, and doubtless did, make an adequate argument on the basis of that theory."

### III. *Conclusion*

For the foregoing reasons [9] we affirm the convictions of appellants Elwood Richmond and Richmond Engineering, Inc. on the violations of 18 U.S.C. § 1001 charged in counts 1 through 6. In addition, we affirm the convictions of appellants Lloyde Richmond, Jr. and Richmond Engineering, Inc. on the violations of 18 U.S.C. § 1001 charged in count ten. However, we vacate judgments of conviction of all appellants on the 18 U.S.C. § 371 conspiracy charge contained in count eleven, and of appellants Rodney Richmond and Lloyde Richmond, Jr. on the 18 U.S.C. § 1001 false statements counts 1–6, and remand to the district court for proceedings consistent with this opinion.

9. Appellants have raised numerous other assertions of error not addressed above. After careful consideration of these arguments and the record in this case, we conclude that appellants' other challenges are without merit.